[Civil No. 2885.  Filed October 3, 1930.]

[291 Pac. 1000.]

BARRON G. COLLIER, INCORPORATED, a Corporation, Appellant, v. FRED J. PADDOCK, JAMES A. GODWIN, WILLIAM ROER, DAVID P. KIMBALL and O. B. MARSTON, Members of and Comprising the City Commission of the City of Phoenix, JOSEPH C. FURST, City Clerk of the City of Phoenix, GEORGE H. TODD, City Manager of the City of Phoenix, and CITY OF PHOENIX, a Municipal Corporation, Appellees.

Messrs. Cunningham & Carson, for Appellant.

Mr. Henry J. Sullivan, City Attorney, and Mr. William C. Eliot, Mr. Leon S. Jacobs, and Mr. Austin O'Brien, for Appellees.

McALISTER, J.—Barron G. Collier, Incorporated, filed an action against the City of Phoenix and its officers praying that they be restrained from interfering with its advertising rights upon the street-cars owned by the City, and from orders sustaining a gen-

eral demurrer to its complaint and dismissing the action, the plaintiff prosecutes this appeal.

It appears from the record that on July 29, 1924, the plaintiff and the Phoenix Railway Company of Arizona, a corporation, then owning and operating the street-car system of Phoenix, entered into a written contract by which the plaintiff was granted for a period of ten years from July 1, 1924, for a consideration of $600 a year for the first three years and $700 a year for the last seven the sole and exclusive advertising rights and privileges upon all the street-cars and busses then or thereafter to be owned, controlled or operated by the Company; that the latter carried out its contract until November 1, 1925, when it sold its street railway system to the City of Phoenix, which has since owned and operated it, including the cars upon which plaintiff had been granted the exclusive advertising rights; that at the time the City purchased this property its attorneys knew of the existence of this contract and its terms and upon information and belief the plaintiff alleges that the Company sold and assigned said contract to the City together with all of its rights and privileges and delivered a duplicate copy thereof to the City which, with the approval of the latter's attorney, adopted and accepted an assignment thereof.

It is further alleged that from November 1, 1925, to July 1, 1929, the City, with full knowledge of the contract and the terms thereof, accepted from plaintiff and placed in the street-cars in accordance with this agreement all the advertising cards and matter sent it by plaintiff and received and retained for this service the monthly payments sent by plaintiff during this period; that by performing these acts it made the contract its own and led the plaintiff not only to believe it had done so but in reliance thereon to enter into various and numerous agreements with national advertisers engaged in interstate commerce to display

their advertising cards and matter in the street-cars in various cities of the United States, including those of Phoenix, to incur obligations to said national advertisers which it would otherwise not have done and to pay money to the City of Phoenix; that plaintiff will suffer great financial loss by reason of the obligation so incurred should the City be permitted to deny the contract and escape performance of its obligations thereunder, and, hence, that it ought to be and is estopped from denying the validity or binding effect of said contract, or that it made the same its own.

It further appears that on June 25, 1929, the City notified the plaintiff that it was proceeding to call for bids and enter into a contract as of July 1, 1929, for the privileges theretofore enjoyed by plaintiff, and that the latter's rights would end as of that date; that thereupon the plaintiff notified the City that it had a valid and existing contract with the City for the exclusive street-car advertising privileges up to and including June 30, 1934, and demanded that it continue to perform its part of this contract; that notwithstanding this notification the City proceeded to issue a call for bids for these advertising privileges and, on July 17, 1929, opened those submitted in response thereto; that the bid found to be the apparent high one was referred to the proper officers for checking, with instructions that a contract for the exclusive advertising privileges upon the streetcars within the City of Phoenix be entered into with said bidder, provided its bid was in proper form; that the City threatens to and will, unless restrained by an order of the court, enter into said contract, and should this be done and the plaintiff denied the exclusive advertising privileges thereon as agreed the plaintiff would be forced to breach its contract with said national advertisers and compelled to face a multiplicity of suits and suffer irreparable damage.

To this amended complaint defendants filed a gen-

eral demurrer and upon its being sustained and the plaintiff's announcing that it would stand upon the cause of action as alleged the case was dismissed. Thereupon the plaintiff brought the matter here for review and assigns these two rulings as error. They present only one question, however, and that is the sufficiency of the amended complaint to state a cause of action.

In the prosecution of its case appellant has proceeded upon the theory that when the City purchased the street-car system from the Phoenix Railway Company it took with it the contract appellant had made with the company relative to the advertising rights and privileges on the street-cars and made the same its own. There is no allegation, except upon information and belief, that this contract was assigned to and accepted by the City, but it is averred as a fact that it was so accepted, and this, it is claimed, is shown by the City's behavior in performing for nearly four years subsequent to the taking over of the street-car system the obligations imposed upon the Company by the contract and the acceptance by it during this period of all the payments due thereunder. Such action on the part of the City, it is contended, led appellant to believe that it had adopted the contract and intended to carry it out and, hence, justified appellant in entering into agreements with national advertisers to place their cards and other advertising matter in the street-cars of Phoenix. This conduct, it is contended, estops the City from denying that it made the contract its own.

It is true that one who takes over a contract or deliberately enters into relations with one of the parties thereto that are inconsistent with any theory except the adoption of it and then acts in such a way "as to lead such party to believe that he has made the contract his own . . . will not be permitted afterward to repudiate it." 13 C. J. 243. See *Chicago*

& A. R. R. Co. v. Chicago, V. & W. Coal Co., 79 Ill. 121; Wiggins Ferry Co. v. Ohio & Mississippi Ry. Co., 142 U. S. 396, 35 L. Ed. 1055, 12 Sup. Ct. Rep. 188. However, before this result may follow it is necessary not only that the party taking over the contract or entering into such relations with the other party to it have the right to accept or reject it, (21 C. J. 1206), but it must also be true, when the person it is claimed has accepted is a municipality whose ·charter contains provisions governing its action in this particular, that the contract has been entered into in the manner prescribed by that instrument. White v. City of Seaside, 107 Or. 330, 213 Pac. 892; Philadelphia Co. v. City of Pittsburgh, 253 Pa. 147, 97 Atl. 1083; Paul v. City of Seattle, 40 Wash. 294, 82 Pac. 601; Moseley Hospital v. Hall, 207 Ky. 644, 269 S. W. 1004; McDonald v. Price, 45 Utah 464, 146 Pac. 550; City of Mobile v. Mobile Electric Co., 203 Ala. 574, 84 South. 816; Forrest City v. Orgill, 87 Ark. 389, 112 S. W. 891; Frisbie Co. v. City of East Cleveland, 98 Ohio St. 266, 120 N. E. 309. The following statement of the rule is found in volume 3 of McQuillin on Municipal Corporations, page 836 (second edition):

"Generally, however, the statutes or the charter, or both, more or less specifically provide how municipal contracts shall be made and executed; and it is settled that the municipality can make a contract only in the method prescribed, and if not so made the contract is invalid and unenforceable. Where the mode is prescribed and limited by law this mode is considered to be exclusive, e. g., requiring competitive bidding, or where the contract must be authorized by ordinance, or must be in writing."

In Board of Control v. Buckstegge, 18 Ariz. 277, 158 Pac. 837, 839, this language was used:

"The law is well settled that, where the method of exercising powers conferred by statute upon municipal corporations is specifically prescribed, that

method must be followed. . . . And when any other method than that prescribed is followed, such acts are without jurisdiction and wholly void.''

In the charter of Phoenix are found the following provisions relating to the way in which the City is required to make and execute its contracts:

''The Commission shall act only by resolution or ordinance.'' Section 8, chap. 4.

''Actions providing for any specific improvement, for the appropriation or expenditure of any public money, except sums less than one thousand (1000) dollars, for the appropriation, acquisition, sale or lease of public property, for the levying of any tax or assessment, for establishing or changing fire limits, or for the imposing of any penalty, shall be taken by ordinance; provided, that such exceptions be observed as may be called for in cases where the Commission takes action in pursuance of a general law of the State.'' Section 12, chap. 4.

''All contracts shall be drawn under the supervision of the city attorney, must be in writing, executed in the name of the City of Phoenix by the manager, except as it may be otherwise provided either by this Charter or by law, and must be countersigned by the city clerk, who shall number and register the same in a book kept for that purpose.'' Section 1, chap. 19.

Appellant contends, however, that the term ''property'' in section 12, chapter 4, refers to real or personal property and not to a right or privilege, or product of a public utility. This construction of the word is too narrow, because ownership in the City of the street-car system carries with it ownership of the space in its cars devoted to advertising, and the right or privilege of applying it to this purpose constitutes property within the meaning of the term as here used. Hence, it is not apparent how there can exist in principle any difference between the leasing of this space for advertising for a period of years

and the leasing of any other property owned by the City since both are public property. The kind or class of property is immaterial. A right or privilege or product of a public utility is just as much property within the meaning of the term as any real estate or personalty the City may own. It is only necessary that this one fact exist, that the City own the property, before the requirement that action providing for its sale or lease must be taken by ordinance applies. Except in those instances in which the City is acting pursuant to some general law of the state, a condition that has no application to the facts of this case, the term, public property, is all inclusive and has the effect of precluding the City from selling or leasing its property in any manner other than that specifically provided by its charter.

It is contended, however, that even though the City did not accept the lease or an assignment thereof in the manner provided in the foregoing sections, still it was a contract that the municipality had a right to enter into originally and this being true the latter's acts in taking it over with knowledge of its terms, in performing these for nearly four years and in accepting during this time the consideration provided therein for this service should be binding upon it and estop it from denying such to be its effect. It is true that the City, had it been the owner of the street-car system in 1924, could have entered into the agreement in question, or it could have accepted an assignment of the lease when it became the purchaser of the street-cars in 1925, but under the authorities there is no way by which it could have done either other than by complying with its charter provisions. An assignment of the lease could have been accepted in no other way than by the City's following the provisions governing the making of such an agreement originally as owner of the property. 5 C. J. 840.

The provision requiring that property be leased by ordinance as well as that stating that contracts shall be in writing and drawn under the supervision of the city attorney, etc., is not merely directory but mandatory and its observance constitutes a condition precedent to the execution of a binding contract by the City. *Sluder* v. *City of San Antonio,* (Tex. Civ. App.) 269 S. W. 463; *Smart* v. *City of Philadelphia,* 205 Pa. 329, 54 Atl. 1025; *Wadsworth* v. *City of Concord,* 133 N. C. 587, 45 S. E. 948; *Roemheld* v. *City of Chicago,* 231 Ill. 467, 83 N. E. 291.

"If a statute or charter," according to paragraph 1283 of volume 3, McQuillin, Municipal Corporations (2d ed.), "says that certain contracts must be let to the lowest bidder, or that they must be made by ordinance, or that they must be in writing, or the like, there is a reason therefor based on the idea of protecting the taxpayers, and inhabitants, and these provisions are mandatory, and while it is undoubtedly true that mere irregularities in making the contract are not fatal to a recovery, yet if the contract is entered into or executed in a different manner, the mere fact that the municipality has received the benefits of the contract which has been performed by the other party, does not make the municipality liable, either on the theory of ratification, estoppel, or implied contract, in order to do justice to the other party by paying the reasonable value of the property or services."

If the lease had been accepted in merely an irregular manner, or the charter had contained no mandatory conditions regulating the specific method in which leases of its property should be entered into, it might be successfully contended that the City is estopped from denying the binding effect of its acts, the same as a private individual would be under the same circumstances. 43 C. J. 249, note 85; *City of Louisville* v. *Parsons,* 150 Ky. 420, 150 S. W. 498, 502. But where there has been no compliance

whatever with such provisions the failure to follow them constitutes not merely an irregularity but action wholly without any validity or binding effect upon the City. To hold otherwise is to enforce contracts against the City which have not been entered into in accordance with the mandatory provisions of its charter and to permit this would result in depriving the City of the protection these were inserted to guarantee. There is, it is true, good authority to the effect that where the contract has been actually entered into in good faith and the municipality has received benefits thereunder a recovery on *quantum meruit* may be had since it would be unjust to permit it to retain them without paying the reasonable value thereof. McQuillin on Municipal Corporations, Vol. 3, 2d ed., p. 853. But such a situation is not here presented since a portion of the contract was yet to be performed by both parties and the City had accepted nothing from appellant for the space in question after ceasing to place therein the latter's advertising matter.

Appellant contends, however, that in the operation of its street-cars and the making of contracts incidental thereto the City was acting in its proprietary as distinct from its governmental capacity and that in the discharge of such functions it was bound by the same rules of dealing that the law prescribes for private individuals or corporations. The distinction between these two functions, however, is not important here because the exercise of the City's power to lease its property, whether in so doing it is acting in a proprietary or governmental capacity, must be in accordance with the mandatory provisions of its charter; no exception to this rule of actions taken in its proprietary capacity is found in that instrument. *City of Astoria* v. *American La France Fire Engine Co.,* (C. C. A.) 225 Fed. 21; *McCracken* v.

*City of San Francisco,* 16 Cal. 591; 43 C. J. 248, 249. In the *City of Louisville* v. *Parsons, supra,* is found this language:

"The limitations and directions of the charter should be and are equally as binding on the city and its council when it acts in one capacity as in the other. What it directs the council to do in a certain manner must be done in that manner. As an ordinance is required to enact legislation which creates indebtedness or incurs liability, or concerning any other matter when the city acts in its governmental capacity, so is an ordinance necessary when it attempts to legislate in any manner, or to create debts, or incur liability, in its private or business capacity. In short, all the charter limitations and directions are at all times in full force and effect, and are, in all states of case, applicable; and whatever the city does must be measured and controlled by the powers granted in the charter."

It follows that the complaint fails to state facts showing that appellant was entitled to an injunction against the City and, hence, that there was no error in the order sustaining the demurrer.

The judgment of the court dismissing the action is, therefore, affirmed.

LOCKWOOD, C. J., and ROSS, J., concur.