Day, J.
 

 The Higbee Realty Company was organized in 1919 by The Higbee Company which was doing a large mercantile business throughout northern Ohio. Its purpose in organizing the subsidiary was to sever
 
 *510
 
 itself from its realty holdings and to confine itself to the mercantile business.
 

 Plaintiff relies for recovery upon the doctrine of disregarding the separate entities of the parent and subsidiary corporation and of holding the parent liable for the obligations of the subsidiary upon the theory that the latter was controlled by stock ownership in the former. It is not disputed that the stock ownership of the subsidiary was in the parent company, the officers and directors of which were also the directors of the subsidiary. Two of these directors were Asa Shiverick, who was president of both companies, and one Austin V. Cannon, an attorney of Cleveland, who was not only director, but who also acted as legal counsel for both companies.
 

 In the opinion of the trial court, no fraud appeared to have been shown on the part of either subsidiary or parent. The legal proposition involved was stated by that court as follows: “Can the court disregard the fiction of separate corporate entity of the subsidiary corporation when the facts disclose that a wrong and an injustice has been perpetrated upon innocent third persons
 
 in the absence of fraud or illegality
 
 and hold the parent company liable for the obligations of its subsidiary?” (Italics ours.)
 

 The trial court frankly stated that counsel on both sides were not in agreement with the law applicable to the case and stated that many of the cases cited had no application to the facts found by the court. With this we can readily agree. A great many cases have been cited by counsel on both sides, a larger number of which concern, not contracts between private individuals, but contracts entered into by a subsidiary, such as railroads or other public utilities, which seek to evade public policy or statute law, whose tendency results in the creation of a monopoly or the evasion of duties which the corporations owe to the public. Many
 
 *511
 
 of them relate to intercorporate contracts by railroads or by public utilities concerning tariffs or rates which the public is required to pay. When we read those decisions in that light, such contracts affecting the public are readily distinguishable from those entered into between individuals or corporations in which the public is not concerned.
 

 In its opinion, the trial court relied, upon the Michigan case of
 
 People, ex rel. Potter, Atty. Genl.,
 
 v.
 
 Michigan Bell Telephone Co.,
 
 246 Mich., 198, 224 N. W., 438, the syllabus of which reads: “Where a corporation is so organized and controlled and its affairs so conducted as to make it a mere instrumentality or agent or adjunct of another corporation, its separate existence as a distinct corporate entity will be ignored and the two corporations will be regarded in legal contemplation as one unit.” That case pertained to telephone rates.
 

 Forty days after the trial court’s opinion in the instant case was filed, the Supreme Court of Michigan, in a case argued before the entire bench, where a private contract was involved — one not affecting public interest — decided the case of
 
 Gledhill
 
 v.
 
 Fisher & Co.,
 
 272 Mich., 353, 262 N. W., 371. The Supreme Court of Michigan distinguished the telephone case relied on by the trial court by using the following language: “However, in that case the disregard of the corporate entity was impelled by the finding of the court that the relationship of parent and subsidiary was being used as a device to justify rates which were not based upon the real cost to the public utility of the service for which it charged, the court distinctly stating: ‘When a corporation exists as a device to evade legal obligations, the courts, without regard to actual fraud, will disregard the entity theory.’ ” We shall later allude to the case of
 
 Gledhill
 
 v.
 
 Fisher, supra.
 

 Powell, in his work on “Parent and Subsidiary Cor
 
 *512
 
 porations” (1931), states on page 10, the legal proposition as follows:
 

 “It is familiar law in all jurisdictions in this country that ownership of stock alone will not render the parent corporation liable. This is but a statement of the fundamental rule that stockholders are not liable for the corporate obligations. The result is the same whether the parent company owns all the stock, or all except directors’ qualifying shares or a small amount in outside hands.”
 

 And again, on page 91, in dealing with the theory of agency existing between parent and subsidiary, and expressing the opinion that the parent is not liable as principal for the acts of its subsidiary unless it expressly authorizes the act, the author states:
 

 “A large corporation organizes a small subsidiary to conduct a limited and special branch of its business. The parent corppration owns all its capital stock, furnishes it with its initial working capital and finances it from time to time as occasion requires. The directors and officers of the two corporations are the same, their principal executive offices are in the same suite of rooms, their respective books of accounts are kept by the same employees. The executives devote ninety-nine per cent of their time and attention to the affairs of the parent corporation and one per cent to those of the subsidiary. All the legal requirements of the subsidiary as a separate corporation, however, are scrupulously observed and its business is efficiently managed.
 

 “Now the law is clear, as we have shown, that under these circumstances the parent corporation is not liable for the subsidiary’s obligations.”
 

 In the instant case, all the legal requirements of the subsidiary as a separate corporation were observed, under the supervision and direction of A. V. Cannon, an attorney, who acted as counsel for both parent and subsidiary.
 

 
 *513
 
 Coming now to the consideration of cases decisive cf the legal question here presented, we will refer only to those cases which relate purely to contracts of subsidiaries and which nowise concern the public.
 
 Majestic Co.
 
 v.
 
 Orpheum Circuit,
 
 21 F. (2d), 720, was decided by Judges Kenyon, Molyneaux and Sanborn, composing the Circuit Court of Appeals of the Eighth Circuit. The syllabus reads in part a? follows:
 

 “3. A corporation is not liable for acts or obligations of another corporation merely because it controls such other corporation by reason of ownership of its stock.
 

 “4.
 
 Generally a corporation will be regarded as a legal entity, and the courts will ignore the fiction of corporate entity and regard corporation as an association only when circumstances justify it, where it is used as a blind or instrumentality to defeat public convenience, justify wrong, or perpetrate a fraud.
 

 “5. Where corporation, organized for purpose of operating a theater, was a legal entity separate and distinct from another corporation owning stock thereof, its contract obligations were not obligations of corporation owning the stock so as to create liability for rent under lease of theater building after sale of stock, in absence of other circumstances
 
 which must he substantiated hy clear and positive proof.”
 
 (Italics ours.)
 

 The case of
 
 Richmond & I. Const. Co.
 
 v.
 
 Richmond,
 
 68 F., 105, was decided by the Court of Appeals of the Sixth District, and was heard before Judges Taft, Lurton and Severens. The first proposition of the syllabus reads:
 

 “The fact that the stockholders in two corporations are the same, or that one corporation exercises a control over the other, through ownership of its stock, or through the identity of the stockholders, such corporations being separately organized under distinct
 
 *514
 
 charters, does not make either the agent of the other, nor merge them into one, so as to make a contract of one corporation binding upon the other.”
 

 While this case was brought against a railroad as the parent company, it did not involve a transaction which affected the public. In the course of the opinion, on page 108, Mr. Lurton, circuit judge, said:
 

 “It contends that under the evidence in this case the contract company was, in legal effect, the railroad company, and that engagements made by it were, in legal effect, engagements made by the railroad company. In support of this, appellant has endeavored to show that the stockholders in each corporation were the same, and that the contract company dominated and controlled the railroad company. * * * The contract company was a legal corporation, wholly distinct and separate from the railroad company. The fact that the stockholders in each may have been the same persons does not operate to destroy the legal identity of either corporation. Neither does the fact that the one corporation exercised a controlling influence over the other through the ownership of its stock or through the identity of stockholders, operate to make either the agent of the other, or to merge the two corporations into one. There is no pretense of any fraudulent concealment of the interest of the one corporation in the other, or of the fact that the persons controlling the one corporation likewise controlled the other.”
 

 What was said by the learned judge of the federal Court of Appeals can be applied to the instant case. The Higbee Company and the realty company were distinct and separate corporations. There was no concealment of the fact that the parent company owned substantially all the stock of the subsidiary. There was no concealment of the fact that the lessee, the realty company, entered into an obligation to pay the
 
 *515
 
 rentals as they accrued. That lease is on record and was constructive notice to all who dealt with the property. Nor was there any fraudulent concealment of the fact that the lessor looked to the realty company for its rentals. Practically all the evidence contained in this record relates to conversation, letters or exhibits concerning transactions which occurred two years or more before the certificate holders acquired any interest in this property. Moreover, not one of the certificate holders testified that he was misled or that he had ever heard of any of the instances which the plaintiffs now rely upon as showing bad faith upon the part of the parent company. But one certificate holder testified, he being an owner of six certificate shares; and his testimony related only to the fact of ownership.
 

 We have referred to the case of
 
 Gledhill
 
 v.
 
 Fisher, supra,
 
 and have stated that it was decided forty days after the trial judge filed his opinion in the instant case. Of all the cases cited by counsel, this Michigan case is on all fours with the instant case. Since the remedy sought, the legal question involved and the facts appearing in that case are so similar to this, we shall quote more extensively than usual from the syllabus and opinion of the Michigan case which, so far as we can find, is the most recent case treating of the doctrine of parent and subsidiary. The syllabus reads in part as follows:
 

 “3. To justify treating sole stockholder or holding company liable as responsible for a subsidiary corporation, it is not enough that the subsidiary is so organized and controlled as to make it merely an instrumentality, conduit or adjunct of its stockholders hut it must further appear that to recognize their separate entities would aid in the consummation of a wrong.
 

 “4. Belief against a parent corporation should be granted only if a refusal to do so would result in an
 
 *516
 
 unjust loss or injury to the complainant since a refusal to recognize the ordinary immunity of stockholders not only overturns a basic provision of statutory or common law but is also contrary to a vital economic policy of the whole corporate concept.
 

 “5. Parent corporation
 
 held,
 
 not liable on land contract of its wholly-owned subsidiary where plaintiff vendors did not know of real party in interest when contract was executed, relied upon corporate vendee as sole and actual purchaser and advance no claim that the parent corporation diverted assets of subsidiary in suit brought after insolvency
 
 of
 
 vendee, and property had depreciated in value so as to inadequately secure balance of purchase price.
 

 “6. Organization of a corporation for the avowed purpose of avoiding personal responsibility does not in itself constitute fraud justifying the disregard of the corporate entity and. those dealing with a corporation know, or are presumed to know, the law in this regard.”
 

 ‘ ‘
 
 9. A corporation may form a subsidiary to protect itself from personal liability and make only the capital of the subsidiary liable for the latter’s obligations. ’ ’
 

 “16. In suit to enforce liability against alleged parent corporation of insolvent corporate land contract vendee, record
 
 held,
 
 insufficient to show vendee was the agent or tool of such parent corporation or that subsidiary was not organized in good faith to pay for, acquire and hold property purchased.”
 

 In the instant case, the parent company is being sued for the installments of rent on a contract made by its subsidiary. In the
 
 Oledhill case,
 
 the parent company was being sued for installments of the purchase money on a land contract which the subsidiary had executed. At the time the contract was made, plaintiffs had sold their property to the subsidiary for $125,000, of which $15,000 was paid down. Payments
 
 *517
 
 were made until the balance was reduced to something over $100,00 and, as stated by the court, was adequately secured, were it not for the subsequent depreciation in values. In the course of the opinion it was stated, at page 359:
 

 “The organization of a corporation for the avowed purpose of avoiding personal responsibility does not in itself constitute fraud justifying the disregard of the corporate entity. In
 
 Elenkrieg
 
 v.
 
 Siebrecht,
 
 238 N. Y., 254, (144 N. E., 519, 34 A. L. R., 592), the court stated:
 

 “ ‘Whether or not the corporation is the creature of Siebrecht is not a determining feature. Whether it be a subterfuge is misleading. Many a man incorporates his business or his property and is the dominant and controlling feature of the corporation. He may do so for the very purpose of escaping personal liability. ’
 

 “Wormser, in his ‘Disregard of the Corporate Fiction and Allied Corporate Problems,’ goes far in holding a parent corporation liable for the debts of its subsidiary where the latter is formed for a fraudulent purpose, but he distinctly limits the rule as.follows (p. 18):
 

 “ ‘It follows that no fraud is committed in incorporating for the precise purpose of avoiding and escaping personal responsibility. Indeed, that is why most people incorporate, and those dealing with corporations know, or at least are presumed to know, the law in this regard. ’
 

 “The law permitted a corporation to own and hold stock in a subsidiary. 2 Comp. Laws 1929, §§ 9968 and 10018-10026. The capital stock constituted a trust fund for the payment of the debts of the corporation.
 
 Clark
 
 v.
 
 E. C. Clark Machine Co.,
 
 151 Mich. 416 [115 N. W. 416];
 
 Peninsular Savings Bank
 
 v.
 
 Black Flag Stove Polish Co.,
 
 105 Mich. 535 [63 N. W. 514]. A stock
 
 *518
 
 holder in a corporation that owns another is not a stockholder in the latter.
 
 Sabre
 
 v.
 
 United Traction & Electric Co.
 
 [district court] 225 F. 601. A subsidiary may be formed for the very reason that prompts individuals to form corporations, to protect themselves from personal liability, to make only its capital liable, to say to those that deal with it, ‘here is the amount of our capital stock; we are a
 
 bona fide
 
 corporation organized for legitimate purposes and doing business in a legal manner. If you want to deal with us on the basis of our liability as shown by our capital set up, you may do so, and if not, you may refrain from so doing.’ There was no fraud in the purchase of the property by the subsidiary without disclosing the ownership of its capital stock. The record does not show that any reliance was placed on who the purchasers were. It was a time when there was a tremendous inflation in real estate, as evidenced by the many cases that have reached this court. The depression and accompanying deflation in values was not foreseen. Plaintiffs and their vendee agreed upon a price. Plaintiffs knew or should have' known that they could only look to the corporation vendee, or the property in the event of a default. A large down payment was made, the depression came, plaintiffs took back their property and retained all that had been paid on it by vendees.”
 

 Practically this entire record relates to transactions occurring long before October 1,1925, when The Union Trust Company and its leasehold trust certificate holders came into the picture. The chief incident occurred on January 31, 1923, and it is to that incident we shall now refer, since the trial judge relied upon its significance in arriving at the judgment which he rendered. It appears that on that date one who had charge of the books of the realty company entered a notation'which consisted in part of the following: “To
 
 *519
 
 transfer assets and liabilities to The Higbee Company.” If, as plaintiff’s counsel contends and the trial court seems to hold, this entry in itself furnished proof that the realty company in fact assigned its assets to the parent company for the purpose of escaping its obligations, this would be tantamount to a legal fraud. The only proof upon this incident offered by the plaintiff was the book entry. The trial court came to the conclusion that there was an actual transfer of assets by the subsidiary and an assumption of liabilities by the parent company. In its opinion, it said: “The court believes that these book entries are of special significance.”
 

 The trial court’s finding that this was a diversion of the subsidiary’s assets by transference to the parent company was erroneous for the following reasons:
 

 (1) Every witness who testified upon the subject, including three officers of the parent company and one Bender, a certified public accountant for Ernst & Ernst, positively testified that there was no transfer of assets from the realty company to The Higbee Company. Mr. Bender was asked: “Q. Did you find anywhere in the books, Mr. Bender, evidence that the leaseholds of The Higbee Realty Company had been assigned or transferred or conveyed to The Higbee Company? A. I did not.” "While the evidence of The Higbee Company’s officials may be said to have been given by interested witnesses, Mr. Bender’s evidence cannot fall within that category. It was not contradicted ; nor was there any evidence showing that there was a transfer of assets.
 

 (2) Substantially all of the assets of the realty company were composed of real estate; namely, its leaseholds and buildings, which had cost more than $1,750,-000. To argue that real estate of this character can be assigned or transferred by simple book entry would
 
 *520
 
 be to argue a legal absurdity. To pass title in this state, deeds of transfer must be executed according to the form required by our statutes.
 

 (3) Another complete answer to the assumption that there was a transfer of assets is found in the undisputed fact that the realty company withheld assets which in 1925 amounted approximately to $2,000,000.
 

 On October 1, 1925, The Crowell & Little Securities Company, which owned the underlying lease, assigned it to The Union Trust Company as trustee under an agreement and declaration of trust of the same date, which was required to be and was filed for record with the Recorder of Cuyahoga county. In that instrument the trustee declared that it held leasehold estates and rents assigned to it by the securities company in trust for the use and benefit of all certificate holders of equitable ownership issued under the trust agreement. The instrument also declared that the trust estate was to be divided into 1920 shares to be designated as “leasehold trust certificates.” Thereafter the trustee bank issued certificates to certificate holders who bought the shares. The certificates recited that they were issued under and in pursuance of a declaration of trust dated October 1, 1925, between the trustee and themselves, the declaration being on record in the office of the County Recorder. The certificate bore upon its face the statement that reference to the declaration was made “for a statement of the rights and title of the holders of this Certificate and all other Certificates issued under , the Declaration, in said property, and of the terms and conditions of said trust.” The certificates issued to purchasers also contained the statement that their holder, by acceptance thereof, “expressly assents to all the terms and conditions of the Declaration and becomes a party thereto as fully to all intents and purposes as if said holder had signed the Declaration.”
 

 
 *521
 
 The original plaintiff in this action purchased 20 of these certificates. Later, because of her physical and-mental disability, one Brobst, owning six shares, intervened and prosecuted this action. In connection with, and as a part of the transaction, The Union Trust Company issued its prospectus with a view to the sale of the 1920 shares it held in trust. This prospectus stated that the certificates were dated October 1, 1925; and since it was after this date that the certificate holders became interested in the leasehold property, it is fitting that this court should examine the record for the purpose of ascertaining whether, in fact, any fraud or wrong to the certificate holders had been committed by the parent company. The prospectus was issued by The Union Trust Company and was not signed by either the subsidiary or the parent company. The only reference to those companies made by the trustee in its prospectus is a statement advising the certificate purchasers of the fact that The Higbee Realty Company was owned by The Higbee Company, and that the realty company was the largest individual sublessee. This advised the certificate holder of the relationship of the two companies and, had they used their prerogative of examining the records of Cuyahoga county, they would have discovered the fact that the lease of June 1, 1922, under which the obligations for rent were assumed, was signed by “The Higbee Realty Company” and not by The Higbee Company. Everyone dealing with this leasehold property must be held to have had constructive notice of the character of its title and the terms upon which it was held.
 

 Coming now to the question whether any wrong was perpetrated before the certificate holders became interested- in the leasehold property, we think the record discloses beyond question that the parent company committed none; nor was anything done by it to mislead either the trustee or the certificate holders. From
 
 *522
 
 1921 until 1929, A. C. Coney, vice president of The Union Trust Company and in charge of its bond department, conducted the transaction which ended in the issuance of the leasehold certificates to purchasers. At the time he testified, however, he was an officer of The National
 
 City Bank.
 
 He testified that “The information as to the security on the values came from The Crowell
 
 &
 
 Little Securities Company,” and he testified further that knowledge of the sum of $2,259,-536 contained in the prospectus of 1925 was probably obtained from The Crowell
 
 &
 
 Little Securities Company and from Ernst
 
 &
 
 Ernst, public accountants. Whether he talked to any others, he did not remember. Mr. Coney testified that he knew all about the ten-year lease which the realty company had made with the parent company at the time he entered into the Union Trust agreement, saying that at that time the ten-year lease still had seven years to run from the time they put out the certificates. He testified further that on October 1, 1925, when the leasehold trust certificates were issued, he was familiar with the fact that The Higbee Realty Company held the sublease to the leasehold property and that, to his knowledge, “The Higbee Company was in no way bound on that sublease;” and that at the time he knew that the lease and buildings were owned by The Higbee Realty Company as distinguished from The Higbee Company. Mr. Coney was asked:
 

 “Q. Was it, to your knowledge, that The Higbee Company was in no way bound on that sublease? A. Yes.
 

 “Q. Mr. Coney, when these leasehold trust certificates were put out, October 1, 1925, you were interested in the security behind them, weren’t you? A. Yes.
 

 “Q. What did you regard as the security behind this particular issue of October 1, 1925, which is called in
 
 *523
 
 your circular, leasehold trust certificates, Higbee corner, 1920 shares of equitable ownership — what did you regard as the security behind that? A. Why, we regarded the value of the property subject to the sublease over and above the capitalized value of the ground rent as the principal physical equity for the lease.
 

 “Q. So that you regarded as security the buildings, let us say, or the equity in the sublease, is that right? A. Well, the value of such property as was subject to the lease minus the value of the rental, of course.”'
 

 Such was the testimony of the official of The Union Trust Company whose duty, as he testified, “had to do with the purchase and underwriting of security issues” and with the putting out of land trust certificates and leasehold trust certificates. In view of this testimony, and there is nothing to contradict it, how can it be said that the trustee bank or the
 
 cestui que trust
 
 could have been misled, or that any wrong had been committed by the parent company in connection with the purchase of those equitable ownership certificates by the plaintiff? The prospectus issued by The Union Trust Company gives full corroboration to the testimony of Mr. Coney. In the prospectus it was stated that The Higbee Realty Company was owned by The Higbee Company, and was the largest sublessee of the leasehold property; and it further stated “the buildings are carried by the company at a depreciation valuation of $2,259,536. The department store is thoroughly modern, and extensive additions and improvements to the property were completed in 1923.” It is quite evident that the trustee for the certificate holders not only had knowledge of the fact that the realty company was the actual lessee but, with that knowledge, it looked for its security, not to The Higbee Company, but to The Higbee Realty Company. Mr. Coney was asked:
 

 “Q. Was it, to your knowledge, that The Higbee
 
 *524
 
 Company was in no way bound on that sublease? A. Yes.”
 

 All of this is easily comprehensible because the testimony shows that in 1925, when this transaction arose, the realty company, in addition to acquiring various subleases, had placed upon the leasehold property improvements valued at more than $1,750,000. In its prospectus, the trustee bank, from information obtained by it, stated that the buildings were carried by the company at a depreciated value of $2,259,536.
 

 In this connection another significant fact appears in this record. On April 16, 1934, counsel for the certificate holders requested the Superintendent of Banks to prosecute the action “as successor to the trustee.” On May 21, 1934, the Superintendent of Banks, through his special counsel, L. F. Laylin, declined to bring the action. Subsequently the Superintendent of Banks was made a party defendant, and the Attorney General and Mr. Laylin, a special counsel, filed their answer, in which, while admitting the execution and record of the various instruments effecting title to the property, having no knowledge of the facts contained in the petition relating to corporate control, the superintendent’s answer denied all the allegations relating thereto. In view of the testimony of A. C. Coney, he could do no less.
 

 "We accept as dispositive of the legal question involved the statement of the trial judge taken from Frederick J. Powell’s “Parent and Subsidiary Corporations,” which is as follows: “* * * the whole basis of the doctrine of disregarding the corporate entity logically requires that the proof must show not only an excessive control over the subsidiary but the actual exercise of that control in such a manner as to defraud or wrong the complainant.”
 

 It has already been stated that a very large portion of this record relates to transactions that occurred more than two years before the certificate holders ob
 
 *525
 
 tained the certificates from the bank trustee. No effort was made to show that any certificate holder ever heard of such transactions or relied upon them in any way. The controlling date in this controversy is
 
 October 1, 1925,
 
 when the certificate holders first entered upon the scene and parted with their money. They never had any transactions with or any contact whatever with either The Higbee Company or the realty company. When they obtained their certificates from the trustee bank, since none of them testified, they must have received their information either from the bank or from the prospectus it issued for the purpose of selling the certificates; and since Mr. Coney, vice president of the bank supervising their issue, had notice of the particulars of which he testified, notice to him was notice to the bank; and notice to the bank must be held to have been notice to the
 
 cestui que trusts
 
 for whom the bank was acting.
 

 “It is well and firmly settled by the whole weight and current of authorities, that notice to an agent is notice to the principal, and that notice to a trustee is* notice to the beneficiary * * "’
 
 Brannon
 
 v.
 
 May,
 
 42 Ind., 92, at 101.
 

 “It is a well-settled principle of law * * * that notice to a trustee is notice to his
 
 cestui que trust. Beverely
 
 v.
 
 Brooke,
 
 2 Leigh., [425] 446;
 
 French
 
 v.
 
 Loyal Co.,
 
 5 Leigh., [627] 641;
 
 LeNeve
 
 v.
 
 LeNeve, 2
 
 Lead. Cas. Eq., 132, 145. * * * ‘Notice to trustees under an ordinary mortgage-deed of a railroad company is notice to the holders of the bonds secured by the mortgage. Such trustees are considered in the light of agents for the negotiating of the loan. They act for those who lend their money on the security of the mortgage. They are charged with the duty of protecting the interests of the bondholders, who are unconnected individuals, having no ready means of acting together except through trustees, whom the law appoints to act for them. Notice to the trustees is
 
 *526
 
 held to affect the title in their hands with reference to incumbrances upon the trust-property. Actual notice to the trustees of a prior equitable mortgage is notice of it to the bondholders, who therefore take their bond subject to the legal consequences of the incumbrance.’
 
 Jones, Ry. Sec.
 
 §363;
 
 Pierce
 
 v.
 
 Emery,
 
 32 N. H., 484, 521;
 
 Miller
 
 v.
 
 Railroad Co.,
 
 36 Vt., 452.”
 
 Crumlish
 
 v.
 
 Railroad Co.,
 
 32 W. Va., 244 at 259.
 

 Furthermore, upon the question whether The Higbee Company, under the doctrine laid down by Mr. Powell, wronged these certificate holders, we must judge the transaction by the financial situation which existed in the fall of 1925 and not in the situation which existed in 1932 or at the time of trial. In 1925 real estate and rental values were mounting; and it was upon the then existing values, as testified to by Mr. Coney, that these certificates were issued. Mr. Coney testified positively that he was interested in the security behind the certificates, and that to his knowledge The Higbee Company was in no way bound on that sublease (the sublease to The Higbee Realty Company). This court will take judicial notice, as did the Michigan Supreme Court in the
 
 Gledhill case,
 
 that seven years later, when the ten-year lease expired, land and rental values and securities generally crashed under the depression. As stated in the
 
 Gledhill case,
 
 this period “was a time when there was a tremendous inflation in real estate, as evidenced by the many cases that have reached this court. The depression and accompanying deflation in values was not foreseen.”
 

 The record discloses that more than $1,750,000 of building improvements were placed upon the leasehold property. It further discloses that The Union Trust Company, after careful inquiry, relied upon the valuation of $2,259,536, which is carried upon the books of the realty company. Since the par value of the leasehold certificates was less than half of the valu
 
 *527
 
 ation in 1925, how can it be argued that any wrong was done to the claimants at that time?
 

 The record discloses that no certificate holder had any transaction with the parent company and that none placed faith in any representation made either by the subsidiary or the parent company. There is no evidence in this record that any certificate holder was misled. Counsel for the certificate holders admit in their brief that “the Supreme Court of Michigan [in the
 
 Gledhill
 
 case] does use language which seems at variance with the rule announced by the other courts,” etc. But the facts presented by the record in the instant case, especially when viewed in the light of the plaintiffs’ conduct and their failure to testify and explain how they were wronged, justify a reversal of the trial court. The
 
 Gledhill case
 
 is the most recent case upon this subject. Its analysis of the authorities dealing with the subject is comprehensive and its judgment was in accord with that of other courts in similar cases.
 

 For the reasons stated in this opinion, the judgments of the lower courts are reversed and judgment is entered in favor of The Higbee Company.
 

 Judgment reversed.
 

 Stephenson, Jones and Matthias, JJ., concur.