**HORDIN, Plaintiff-Appellee, v. CLEVELAND (City), et al., Defendants-Appellants.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 19787.   Decided July 9, 1945.

Jones, Day, Cockley & Reavis, Cleveland for plaintiff-appellee.

Lee Howley, Law Director, and Jos. F. Smith, Asst., Cleveland, for City of Cleveland.

S. T. Gaines, Cleveland, and L. J. Shoup, Cleveland, for transit board.

Squire, Sanders & Dempsey, Cleveland, for Mitchell, McCandless & Klaus.

## OPINION

By SKEEL, P. J.

This cause comes to this court on questions of law and fact. The plaintiff claims the right to bring this action as a taxpayer and seeks to enjoin the defendants from carrying out the provisions of certain contracts which it is claimed were entered into contrary to law.

The Cleveland Railway Company as a part of the business of providing street car and bus service to the citizens of Greater Cleveland contracted for the services of advertising specialists to procure advertising matter from various business concerns and placing the same in spaces provided therefor in its street cars and busses.

In 1941 The Sterns Advertising Company, with whom the Cleveland Railway Company had contracted for this service, went into bankruptcy. For the purpose of re-establishing the revenue derived from street car card advertising, The Cleveland Railway Company organized a subsidiary corporation under the name of The Railway Advertising Company of Cleveland. The officers of the company thus formed were officials of the Railway Company who after considerable search employed John Mitchell (now one of the partners of Mitchell, McCandless & Klaus, defendants herein) as General Manager. The Railway Company then entered into a contract with its subsidiary, employing its services in the conduct of its car card advertising business.

The City of Cleveland on April 28, 1942, purchased the street car and bus system from the Cleveland Railway Company, and, as a part of the transaction, all capital stock (five shares) of The Railway Advertising Company was assigned to

Errata: The name *L. J. Shoup,* as it appears above as attorney for transit board, should be *Robt. J. Shoup.*

the purchaser. The Railway Advertising Company continued to handle the car card advertising business of the system under the same terms as it did for The Cleveland Railway Company. The contract with the Railway Company and The Railway Advertising Company provided that it should terminate on December 31, 1943, and the Railway Advertising Company contract with Mitchell was to run until December 31, 1942.

Shortly before the members of the new transit board (which was created by an amendment of the City Charter by a vote of the people at the November, 1942, election) took that office, they became the directors and officers of the Advertising Company, with the exception of the offices of general manager and treasurer. These offices Mr. Mitchell continued to fill with the approval of the directors consisting, as aforesaid, of the members of the new transit board.

The manner in which the transit system should thereafter handle the car card advertising business became a matter of deep concern of the transit board. They appointed one of the officials of the system to make a complete study of the problem as well as calling on Mr. Mitchell for reports on various subjects involved in the conduct of the business.

The Board finally determined to follow the procedure of the great majority of the transit systems throughout the country, that is by employing the services of an independent contractor. With this end in view the Transit Board invited all those in the street car card advertising business who wanted to, to submit proposals looking toward their employment by the transit system. Many agencies responded to the board's request and each was given full opportunity to present their respective proposals and to demonstrate their abilities to carry them out.

After a very exhaustive study of the proposals and the respective abilities of those who submitted them, the Board determined that the proposal of the firm of Mitchell, McCandless & Klaus would be most advantageous to the transit system.

The Board therefore entered into a contract with Mitchell, McCandless & Klaus, employing their services to conduct the business of procuring and servicing the car card advertising business for the transit system.

The contract between the partnership and the transit board in part provided that the partnership is granted the exclusive right to solicit, procure and service advertising to be placed in all of the cars, busses and vehicles of the transit system used on its routes and such as shall thereafter be owned, controlled, operated or traversed by the transit system.

The space to be used for displaying advertising is described in the contract and it is also provided that the transit system shall furnish such racks or frames as are required. The transit system agrees to use reasonable precautions to protect the advertising placed in its vehicles from damage. The partnership is made responsible for damage caused by the placing of advertisements in the cars and vehicles of the transit system and also is to be held responsible because of improper or scurrilous language in the advertising matter used, or because of infringement of copyrighted material. It is further provided that the rights of the partnership shall be binding upon lessees, purchasers or assignees of the transit system.

In consideration of the rights granted, the partnership is to retain an amount equal to 40% of the gross receipts received from advertisers. The contract can be terminated before its expiration date which is May 31, 1948 at the option of the transit board, for failure of the partnership to make payments within ten days of the due date as provided by the contract; for any other default not corrected within thirty days after notice thereof; also for failure to pay to the system during any twelve month period preceding notice, $120,000.00; or, because of the filing of a voluntary petition in bankruptcy, or the appointment of a receiver, or the making of an assignment for the benefit of creditors of the partnership. If the partnership performs its obligations under the contract to the satisfaction of the transit board, then it is provided that it shall enjoy all of the privileges and rights granted under the agreement.

The partnership agrees to give its full and complete attention and supervision to the securing of advertising business for the transit system as contemplated by the agreement and not to engage in other advertising business with others located outside a radius of eighty miles from Public Square, Cleveland, Ohio, except when acting as advertising counsel; and, finally the partnership is prohibited from selling or assigning its rights under the contract without the consent of the transit board.

When the transit board determined that it was not advisable to continue the railway advertising company as the agency through which to conduct the car card advertising business of the transit system, it proceeded to effect its dissolution and acting as the directors and representative of the stockholder of such company, proceeded to dispose of its assets as provided by law.

The assets consisted of property such as furniture and springs for holding car cards in place, certain accounts receivable and also unexpired contracts with advertisers. The most logical purchaser of such assets was the firm of Mitchell, McCandless & Klaus, because of the fact that they had been selected to carry on the car card advertising business. A contract was therefore entered into between Mitchell, McCandless & Klaus and the Railway Advertising Company by which the partnership purchased all the personal property of the Railway Advertising Company; agreed to collect the accounts receivable for the company; took an assignment of the contracts it had for car card advertising on the Rapid Transit Lines for which a separate consideration of $1200.00 was paid and also procured an assignment of the unexpired advertising contracts for advertisements in the cars of the transit system and agreed to service them at the same rate that the partnership was to be paid under the terms of its contract with the Transit Board.

There are two causes of action in the plaintiff's petition. The first cause of action seeks to enjoin the transit board and the partnership from carrying out the contract giving the partnership the exclusive right to manage the transit system's car card advertising business and seeking a declaratory judgment against the validity of the contract, for the reason that the transit board did not advertise for bids as required by the City Charter nor did it procure the consent of Council by ordinance passed not as an emergency matter as required by Section 113-3 of the Charter of the City of Cleveland. This last allegation was not contained in the plaintiff's letter served upon the Law Director of the City of Cleveland requesting him to bring this action, prior to its being filed by the plaintiff as a taxpayer.

The second cause of action seeks similar relief with respect to the contract between the Railway Advertising Company and Mitchell, McCandless & Klaus, for the purchase of the assets of the advertising company then in process of dissolution, for the reason that the transit board failed to request or advertise for bids so that the property could be sold to the highest and best bidder and further because the transit board failed to procure the consent of council before disposing of said assets as required by the City Charter.

The sections of the City Charter involved, read as follows:

Section 101: "There shall be in the department of finance a division of purchases and supplies. The commissioner of purchases and supplies shall make all purchases for the city in the manner provided by ordinance, and shall under

such regulations as may be provided by ordinance and by direction of the board of control, sell all property, real and personal, of the city, not needed for public use or that may have become unsuitable for use or that may have been condemned as useless by the director of a department. He shall have charge of such store rooms and warehouses of the city as the council may by ordinance provide."

"Sec. 102: Before making any purchase or sale, the commissioner of purchases and supplies shall give opportunity for competition, under the rules and regulations as the council shall establish. Supplies required by any department may be furnished upon requisition from the stores under the control of the commissioner of purchases and supplies, and whenever so furnished shall be paid for by the department furnished therewith, by warrant made payable to the credit of the store's account by the division of purchases and supplies. The commissioner of purchases and supplies shall not furnish any supplies to any department unless there be to the credit of such department an available appropriation balance in excess of all unpaid obligations sufficient to pay for such supplies."

Sec. 108: "All contracts involving any expenditure in excess of five hundred dollars ($500.00) shall first be authorized and directed by ordinance of council. When as authorized and directed, the director of the department involved shall make a written contract with the lowest responsible bidder, after advertisement once a week for two consecutive weeks in the City Record. There shall be no splitting of orders to void the effect of this section, and any contract made contrary to or in evasion of the foregoing provisions of this section, shall be illegal and void."

Sec. 109: "All contracts, agreements or other obligations entered into and all ordinances passed, resolutions and orders adopted, contrary to the provisions of the preceding sections, shall be void, and no person whatever shall have any claim or demand against the city thereunder, nor shall the council, or any officer of the city, waive or qualify the limits fixed by any ordinance, resolution or order, as provided in Sec. 106, or fasten upon the city any liability whatever, in excess of such limits, or release or relieve any party from an exact compliance with his contract under such ordinance, resolution or order."

Sec. 113-3: "* * * * * * *. Subject to the general provisions of this charter, except as modified with reference to the board and the specific provisions in this and the next succeeding sections limiting such power, the board shall have full and complete supervision, management and control of the transit system, both within and without the city limits, in-

cluding the operation, maintenance and construction of the system, a determination of routes, types of rolling stock and equipment, time schedules and stops, the operation of cars, busses and other equipment and the fixing of the salary or compensation of its employees. The board shall have no power or right to acquire by purchase, lease or otherwise, any transportation system, or any part thereof, without the consent of council, by ordinance passed not as an emergency measure, nor shall the board have the right or authority to dispose of any of the property or capital assets of the transit system without similiar consent of council. The board shall take no action concerning any permit, franchise, extension or renewal thereof, or other right to operate the transit system, within the territorial limits of any other municipality or governmental subdivision, unless such right to operate has been first accepted by ordinance of council. No new capital expenditure shall be made except with the approval of council. * * *"

Sec. 113-4: "Notwithstanding the provisions of Section 108, and as an exception thereto, the board shall authorize all contracts involving an expenditure for the transit system in excess of five hundred ($500.00) and no contract involving such an expenditure in excess of ten thousand dollars ($10,000.00) shall be made unless first authorized by ordinance of council. All contracts in behalf of the board shall be made by the chairman after competitive bidding with the lowest responsible bidder, and all contracts in excess of five hundred dollars ($500.00) shall first be advertised once a week for two consecutive weeks in the City Record; provided, however, that in case of emergency which could not reasonably have been foreseen, when delay would result in great public inconvenience or irreparably endanger the property or operations under control of the board, purchases involving an expenditure not exceeding ten thousand ($10,000.00) dollars may when authorized by the board, be made by the chairman without such advertising but competitive bidding shall be requested by posting or otherwise. Notwithstanding the provisions of Section 101 of the charter, as an exception thereto, purchases for the board shall be under the control of the board; provided, however, that the facilities of the division of purchases and supplies shall be available to the board when requested by the board."

The public agency which is here under consideration is one that is not supported by tax funds. The transit board does

not in the performance of its duties, exercise duties involving a governmental function; its activities in managing the publicly owned transit system are proprietary in character. The Cleveland City Charter as amended to provide for the operation of the transit system through the transit board intended to vest such board with full power to manage the business of the system, limiting their authority only in the following respects:

First, the acquiring of any other transportation system or part thereof, by purchase, lease or otherwise, or "the disposal of any of the systems, property or capital assets, can be accomplished only after consent of the City Council by ordinance passed not as an emergency measure;" Second, expenditures of money in excess of $10,000.00 can be made only when authorized by ordinance of the city council, and third; by requiring that contracts for or on behalf of the board shall be made by the chairman, after competitive bidding, with the lowest responsible bidder and all contracts in excess of five hundred dollars shall be advertised once a week for two consecutive weeks in the City Record except in cases of certain emergencies.

The contract between the transit board and the partnership of Mitchell, McCandless & Klaus does not come within any of these restrictions. It was a contract whereby the board engaged the services of the partnership as car card advertising specialists. It is difficult to understand what good would have been accomplished by competitive bidding. On what basis is the Board to determine who is the lowest responsible bidder when the employment of the services of an advertising specialist and not the purchase of property or the acquiring of a property right (as the term is used in the Charter) was the subject under consideration? The courts have without exception held that Charter provisions and ordinances requiring competitive bidding as a basis for entering into contractual relations with a governmental body are not intended to apply to contracts for personal services.

In McQuillan on Municipal Corporations, 2nd Edition volume 3, page 1182, section 1292, the rule is stated as follows:

"Provisions as to competitive bidding have been held not to apply to contracts for personal services depending upon the particular skill or ability of the individual, such as the services of a court stenographer, an attorney at law, a superintendent or architect.* * * * Generally the requirement does not apply to the employment of a professional man, in which case the authorities have a discretion as to his qualifications."

524

This question was passed upon by this court in the case of **City of Cleveland v Lausche, Mayor, 71 Oh Ap 273** where Section 108 of the charter was being considered with reference to a contract between the city and the Museum of Natural History whereby the city employed the services of the museum to operate Brookside Zoo. The court said:

"This provision does not apply to legislation providing for the employment of the kind of services herein being considered which in a very real sense are professional in character. The council therefore had the power to authorize the contract entered into between the city and the museum."

In the case of **State ex rel Doria v Ferguson, Auditor etc., 145 Oh St 12**, there was presented to the supreme court of Ohio the question as to whether or not a contract with an attorney at law to prepare for the Highway Department abstracts of title of parcels of land required for highway purposes, could be entered into between the defendant and the city without first having submitted the proposal to employ such a person to competitive bidding as required by §1206 GC, which provides in part that before the director of highway can enter into a contract in furtherance of a state highway improvement he must advertise for bids in a newspaper of general circulation for two consecutive weeks and then award the contract to the lowest competent and responsible bidder. The Divisional Engineer in employing the services of the relator did not ask for bids by the method required in §1206 GC, and therefore the Auditor of State refused to pay the warrant for his services in the sum of $5780.00. The supreme court said on page 17 of the opinion:

"While it is true that public contracts may not ordinarily be entered into without advertisement and competitive bidding, a well recognized exception exists where the contract is for personal services of a specialized nature requiring the exercise of particular skill and aptitude. 43 Amer. Juris. 770, Sec. 28. 142 A. L. R. Annotation 542. This exception has been recognized and applied in Ohio.

Cudell v City of Cleveland 16 C. C. (n. s.) 374; 31 C. D. 548, affirmed without opinion; 74 Oh St 476, 78 N. E. 1123, 33 Ohio Juris. 683, Sec. 14. Compare **State ex rel Bain v Yeatman and 22 Oh St 546.**"

"The services relator was engaged to supply fall within the noted exception.* * * * *"

That the contract here under consideration was one for the personal services of the partnership as car card advertising specialists, cannot be seriously questioned. In the case of Eastern Advertising Co. v McGraw, 42 Atl 923 (Court of Appeals of Maryland 1899) the Eastern Advertising Company entered into a contract with McGraw whereby the Advertising Company was to carry McGraw's advertisement in 250 street cars in Baltimore for 12 months at $150.00 per month. It was provided by the contract that the cards were to be at the approval of the advertising company and if said company were "to cease to have the right to maintain the advertising * * * the contract shall terminate." McGraw & Company some time after the contract had been in full force and effect, received notice that the Eastern Company had sold all of its street car advertising interests in the Baltimore district to the Southern Street Railway Advertising Company and advising the advertiser that payments for advertising after September 1, 1897 should be made to the Southern Street Railway Advertising Company. McGraw refused to pay the new company for the first month's service and this action was brought. Among other defenses the defendant claims:

"That the contract sued on is personal to the parties thereto, the delictus personae element forming an ingredient of it and as the defendants did not assent to its sale or transfer, a recovery cannot be had upon it for the use of one who was not a party to it."

The court in sustaining this defense said, on page 926 of the report:

"It is perfectly obvious that skill and judgment as well as taste, were required to be exercised by the Eastern Company both in the designing of the cards and in selecting the type in which they were to be printed and in the arrangement of the cards in the cars. Its approval of the style and contents of the cards was necessary before any card could be placed in the cars. The contract was one where the 'delictus personae' was most material. It made no provision for assignment and a transfer of it for performance by another was clearly not contemplated by either of the parties to it."

The fourth headnote of the case is as follows:

"A contract to display advertisements in a street car, the cards being subject to the approval of the advertising company, is one in which the parties rely upon the skill and experience of the company in making such displays and hence is not assignable by the latter."

In the case of Smith v Zuckman, 282 N. W. 269 (supreme court of Minnesota 1938) the plaintiff's intestate had entered into a contract to use his best efforts to solicit contracts for advertising to be shown on the screen in defendant's moving picture theater. He had been granted the exclusive right to solicit advertising contracts for that purpose. After decedent's death the defendant contracted with another for the service and refused to further perform under the terms of the contract with the decedent and this action was brought by his administrator for damages and injunctive relief. To the petition setting forth the facts a demurrer was filed and sustained by the trial court. The supreme court in affirming the ruling of the trial court, said:

"When rights arising out of contract are coupled with obligations to be performed by the contractor and involve such a relationship of personal confidence that it must have been intended that the rights should be exercised and the obligations performed by him alone, the contract, including both the rights and his obligations cannot be assigned without the consent of the other parties to the original contract."

See also: Fuller & Smith v Routzahn, 23 Fed 2, 959.

In the case of Ward v American Health Food Co. 96 N. W. 388 (3rd headnote, Supreme Court of Wis. 1903) the rule is stated as follows:

"Defendants contracted with plaintiffs to place their advertising cards in certain railway cars in a manner provided from June 19, 1900 to July 10, 1901. The contract also provided that 'non use of space from advertisers' acts or omissions was advertiser's loss; held, that the contract did not constitute a sub-lease of space which had been let by the owners of the cars to plaintiffs, but was a contract for plaintiff's personal services and was therefore executory until the date provided by the contract for its termination."

See also, Neely v Havana Elec. Ry. Co. 10 Atl. 2nd 358 (Supreme Court of Maine 1940).

The case that is relied upon by plaintiffs is Collier v Padock 291 Pac. 1000 (Sup. Ct. of Arizona 1930). In that case the principal question presented was one of estoppel. The plaintiff had a contract with the Phoenix Railway Co. of Arizona whereby it bought the right to the advertising space in its street cars for ten years at a stated price per year. Thereafter the city acquired the street car system and for about four years thereafter plaintiff continued to use the advertising space and the city accepted the payments as they came due. Before the expiration of the ten year period, the city determined "to call for bids and enter into a contract as of July 1, 1929 for the privileges heretofore enjoyed by plaintiff" to the lowest and best bidder as required by Sec. 12, Chapter 4 of the city charter, which in part provides that "actions providing for * * * the sale or lease of public property * * * shall be taken by ordinance * * *."

The plaintiff's petition seeking a restraining order against the city was demurred to by the defendant. The trial court sustained the demurrer and the ruling was affirmed by the supreme court on the ground that the contract was for a property right and that the only way the city could be bound in the disposal of a property right was by ordinance.

The question as to whether or not the contract was for the personal services of Barron & Collier Inc., seems not to have been suggested and therefore the court did not pass upon that point and the case cannot therefore be urged as in point on the question before us.

The right to have an advertisement displayed in the street cars and busses of the Cleveland Transit system is indeed a property right but the transit system did not dispose of such right to the partnership by the contract now under consideration. What the partnership received by the terms of the contract was the exclusive right to solicit advertising to be displayed in the transit system's vehicles and the obligation of servicing such contracts as were made with the advertisers. The partnership was made responsible for the character of the displays put in the vehicles. Under these circumstances the partnership could not have assigned its rights under the contract or made such assignment binding either on the advertisers or on the transit system. The contract in every detail provided for the performance of personal services and therefore did not involve such a property right as was intended by Sec. 113-3 of the city charter, to require that it be authorized by ordinance or require that the transit system should advertise for bids and then let the contract to the lowest (or highest) responsible bidder.

We come now to the question of whether or not the sale of the assets of Railway Advertising Company of Cleveland to the partnership as a part of the process of its (The Railway Advertising Company's) dissolution as provided by statute, was a disposal of property in the possession of the transit system, such as would require authorization by ordinance of the city council; and also require that the proposed sale be advertised in the City Record and the sale thereafter consumated with the highest responsible bidder as required by Sec. 113-3 and 4 of the charter of the city of Cleveland.

The purchase of all the assets of The Cleveland Railway Company, which included all of the issued and outstanding stock of the Railway Advertising Company of Cleveland, did not work a dissolution of such company. It therefore continued to be the owner of its assets until sold as provided by law under §§8623-82 to 84 inclusive. Sec. 8623-82 GC in part provides:

"The directors named in such certificate (dissolution certificate provided in §8623-80 GC) * * * shall act as a board in accordance with the regulations and by laws of the corporation, until the corporation is completely wound up and they shall, as speedily as may be practicable to a complete winding up of the corporation and to the extent necessary or expedient to that end, shall exercise all of the powers of such dissolved corporation and without prejudice to the generality of such authority, may * * * sell its assets at public or private sale, make conveyance in the corporate name * * * settle or compromise claims in favor of or against the corporation * * * and do and perform all acts necessary or expedient to the winding up of the corporation * * *."

In the best interests of the carrying out of the duties imposed by law upon the directors of the corporation there was no reason why they should have transferred these assets to the transit system after they had determined to deal with an independent contractor in carrying on the car card advertising part of the transit system's business. The most logical purchaser of such assets would be the new advertising agent employed by the transit system.

In making such sale as was done in this case, the transit board was acting as the directors of the Railway Advertising Company and not as members of the transit board. No claim

of fraud or collusion in the use of the subsidiary corporation being claimed or proved, it maintained its legal entity until dissolved as provided by law.

In the case of **North v Higbee Co. 131 Oh St 507** the supreme court of Ohio said:

"The separate corporate entities of a parent and subsidiary corporation will not be disregarded and the parent corporation will not be held liable for the acts and obligations of its subsidiary corporation, notwithstanding the facts that the latter was controlled by the parent through its stock ownership and that the officers and directors of the parent corporation were likewise officers and directors of the subsidiary, in the absence of proof that the subsidiary was formed for the purpose of perpetrating a fraud and that domination by the parent corporation over its subsidiary was exercised in such manner as to defraud complainant."

The fact that the purchaser of the stock of the company was a municipal corporation does not change the rule.

Commonwealth v Monongahela Bridge Co. 64 Atl. 909, 216 Pa. St. 108.

We conclude therefore that the sale of the assets of the Railway Advertising Company by the directors as a part of the dissolution of said corporation, under the provisions of §§8123-82 to 84 GC inclusive, in no way involved Sections 113-3 and 4 of Cleveland City Charter and did not require either the consent of council or the necessity of advertising the proposed sale in the City Record for two consecutive weeks and then consummating the sale to the highest responsible bidder. We hold that the sale as conducted was in all respects in accordance with the statutory requirements of the State of Ohio.

LIEGHLEY, J., concurs.

MORGAN, J., concurs in the decree for defendants on the first cause of action but DISSENTS from the similar decree on the second cause of action for the reason that property and assets of the Railway Advertising Company were property and assets of the "transit system" within the meaning of Sec. 113-3 of the City Charter and therefore could not be disposed of without the consent of the City Council.