OPINION
{¶ 1} Defendant-appellant, Liberty Mutual Insurance Company ("Liberty"), appeals from the judgment of the Franklin County Court of Common Pleas, in which that court granted summary judgment in favor of plaintiffs-appellees, James R. Parrish ("Parrish") and his wife, Barbara Parrish (collectively referred to as "appellees"), on their claim for a declaration that they are entitled to underinsured motorist ("UIM") coverage under a business auto insurance policy that Liberty issued to Oldcastle, Inc. ("Oldcastle"). Oldcastle is the parent company of Oldcastle Materials, Inc., which, in turn, is the parent company of Parrish's employer, Shelly Co. ("Shelly"). The court also awarded to appellees prejudgment interest on the stipulated amount of damages from the date of the accident that gave rise to this action.
 {¶ 2} In addition, defendant/cross-appellant, Travelers Insurance Company ("Travelers"), appeals from the same judgment, in which the court of common pleas granted appellees a summary judgment on their claim that they are entitled to UIM coverage under an automobile insurance policy that Travelers issued to appellees, and also ordered Travelers to pay appellees prejudgment interest from the date of the automobile accident. *Page 3 
 {¶ 3} The procedural history and the undisputed facts pertinent to these appeals follow. On June 30, 2000, James R. Parrish ("Parrish") was employed as a police officer with the Mifflin Township Police Department. On that date, Parrish was working special duty on behalf of Shelly. In the course and scope of his duties on behalf of Shelly, Parrish was injured when an automobile owned and negligently operated by Celena Coles ("Coles") struck his Township-owned cruiser.
 {¶ 4} Coles was insured under an automobile liability policy issued by Geico Indemnity Insurance Company, with a policy limit of $12,500 per person/$25,000 per occurrence. Parrish was the holder of a personal automobile insurance policy issued by Travelers, which provided UIM coverage with limits of $100,000 per person. Liberty had issued a business auto policy to Oldcastle. The effective period of that policy was September 1, 1999 to September 1, 2000.
 {¶ 5} On September 1, 1999, Oldcastle's risk manager, Joseph B. McWilliams ("McWilliams"), executed an Ohio UM[1] /UIM selection/rejection form, purporting to select UIM limits of $12,500 per person/$25,000 per occurrence. In March 2000, Oldcastle Materials, Inc., acquired Shelly. According to Doug Radabaugh ("Radabaugh"), Shelly's Chief Operating Officer, Shelly agreed to join and be bound by the insurance program and coverages that Oldcastle had entered into with Liberty on behalf of all the named insureds. Effective April 1, 2000, Shelly became an additional named insured on the Liberty policy, and was added to the schedule of named insureds. Nearly three months later, Coles' vehicle struck Parrish's cruiser. *Page 4 
 {¶ 6} On June 28, 2002, appellees filed a complaint against Coles, Travelers, National Union Fire Insurance Company, and the Ohio Township Association Risk Management Authority ("OTARMA"), which is the township government risk pool providing auto insurance to Mifflin Township. On October 18, 2002, appellees amended their complaint, adding Liberty as a defendant and dropping National Union Fire Insurance Company as a defendant. Appellees asserted a claim for negligence against Coles, with Parrish seeking damages for personal injuries and his wife seeking damages for loss of consortium. Appellees also sought a judgment declaring that Coles was an underinsured motorist and that appellees are entitled to UIM coverage under both the Liberty and Travelers policies.
 {¶ 7} On April 4, 2003, Liberty and OTARMA filed motions for summary judgment, arguing that appellees were not entitled to UIM coverage under their respective insurance policies. On January 16, 2004, the trial court granted Liberty's motion in part and denied it in part, finding that Parrish's family members were not entitled to UIM coverage under the Liberty policy, but that Parrish is entitled to such coverage, with a limit on the UIM coverage of $1,000,000. On November 19, 2004, following further discovery and a mediation, the parties agreed that Parrish's damages are $145,000, after set-off of Coles' policy limits, which had already been tendered with the defendants' consent.
 {¶ 8} On December 17, 2004, the Supreme Court of Ohio decided the case of Hollon v. Clary, 104 Ohio St.3d 526, 2004-Ohio-6772, 820 N.E.2d 881. In that case the court held that "[a] signed, written rejection of [UIM] coverage is valid under the H.B. 261 version of R.C. 3937.18 if it was made in response to an offer that included a brief description of the coverage and the coverage premiums and limits. Once a signed *Page 5 
rejection is produced, the elements of the offer may be demonstrated by extrinsic evidence." Id. at syllabus. In light of Hollon, the court of common pleas ordered supplemental briefing on the issue of whether there had been a valid reduction of UIM limits for the Liberty policy.
 {¶ 9} On December 12, 2005, the court of common pleas issued a decision and entry granting OTARMA's motion for summary judgment, and granting in part and denying in part Liberty's motion for summary judgment. Specifically, the trial court made several factual and legal determinations.
 {¶ 10} The court found that on September 1, 1999, Oldcastle purchased the Liberty policy. The September 1, 1999 declarations page lists Oldcastle and its subsidiaries (listed by name on a five-page schedule called Endorsement 1) as named insureds. The declarations page further provides liability limits of $1,000,000 per accident, and specifies that the premium for liability coverage is $2,911,754, and that the premium for UIM coverage is included within that figure. The limits for UIM coverage are specified as $12,500 per person/$25,000 per occurrence. The court further found that Oldcastle acquired Shelly in March 2000. On April 1, 2000, Shelly was added to the schedule of named insureds under the policy.
 {¶ 11} The court found that, as a Shelly employee, Parrish is an insured under the Liberty policy because the policy suffers from the same ambiguity identified in Scott-Pontzer v. Liberty Mut. Fire Ins.Co. (1999), 85 Ohio St.3d 660, 710 N.E.2d 1116.
 {¶ 12} In ITEM ONE of the declarations, "you" and "your" mean the "person or organization shown as the named insured." The liability portion of the Liberty policy applies to "any auto" but the UIM coverage applies to "owned autos only." The policy *Page 6 
defines "owned autos" as "those autos you own * * *. This includes those autos you acquire ownership of after the policy begins." In its motion for summary judgment, Liberty had argued that because Parrish's township police cruiser was not owned by Shelly or Oldcastle, the cruiser does not qualify as an "owned auto" so as to trigger UIM coverage for Parrish's accident.
 {¶ 13} The court rejected Liberty's argument that Parrish is not entitled to UIM coverage because he was not operating an "owned auto" at the time of his accident. The court found that Liberty's offer of UIM coverage to Oldcastle was invalid because it did not meet the requirements found in Linko v. Indemn. Ins. Co. of North America (2000),90 Ohio St.3d 445, 739 N.E.2d 338. The court further found that, because Shelly was not a subsidiary of Oldcastle at the time Oldcastle purchased the policy, it could not be bound by the limits that Oldcastle selected, and that Liberty was required to make a separate written offer of UIM coverage to Shelly when Shelly was added as a named insured. This was never done and, as a result, the court found, UIM coverage under the Liberty policy arose by operation of law.
 {¶ 14} The court determined that while the "owned auto" exclusion would apply to liability coverage, it did not apply to UIM coverage because that coverage arose by operation of law. Because the Liberty policy provided liability limits of $1,000,000 for "any auto" and because the Mifflin Township police cruiser qualifies as "any auto," the trial court found that UIM coverage arose by operation of law in the amount of $1,000,000.
 {¶ 15} On January 11, 2006, the parties stipulated in writing that Parrish's damages, after a set-off in the amount of Coles' policy limits, totaled $145,000. Also on that date, appellees filed motions for prejudgment interest against both Liberty and *Page 7 
Travelers, seeking prejudgment interest from the date of the accident. In response, Liberty argued that prejudgment interest should be awarded from January 11, 2006, when the stipulation of damages was filed, or from December 12, 2005, when the court issued its decision determining that Liberty's policy provided UIM coverage to Parrish. Alternatively, Liberty argued that the earliest date from which prejudgment interest should be calculated is the date in March 2003 when Parrish settled with Coles' insurer, thereby exhausting the tortfeasor's policy limits and triggering UIM coverage. Travelers, too, argued that prejudgment interest should be awarded from January 11, 2006, or, at the earliest, from December 12, 2005.
 {¶ 16} By decision and entry dated June 13, 2006, the trial court granted both motions and awarded prejudgment interest under both policies from the date of the accident. By judgment entry journalized June 30, 2006, the trial court entered judgment against Liberty and Travelers in the amount of $145,000, on a pro rata basis, plus prejudgment interest at the statutory rate from June 30, 2000. Liberty timely appealed to this court, and Travelers filed a cross-appeal.
 {¶ 17} In its appeal, Liberty presents two assignments of error for our review, as follows:
 1. THE TRIAL COURT ERRED IN DENYING DEFENDANT LIBERTY MUTUAL INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT.
 2. THE TRIAL COURT ERRED IN AWARDING PREJUDGMENT INTEREST TO PLAINTIFF FROM THE DATE OF THE ACCIDENT. *Page 8 
 {¶ 18} Travelers presents one assignment of error, as follows:
 The Trial Court erred in awarding prejudgment interest against Travelers from the date of the accident.
 {¶ 19} We review the trial court's grant of summary judgment de novo.Coventry Twp. v. Ecker (1995), 101 Ohio App.3d 38, 654 N.E.2d 1327. Summary judgment is proper only when the party moving for summary judgment demonstrates: (1) no genuine issue of material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds could come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, when the evidence is construed in a light most favorable to the nonmoving party. Civ.R. 56(C); State ex rel. Grady v. State Emp.Relations Bd. (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343. We review questions of law de novo. Nationwide Mut. Fire Ins. Co. v. Guman Bros.Farm (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684, citing Ohio BellTel. Co. v. Pub. Util. Comm. (1992), 64 Ohio St.3d 145, 147,593 N.E.2d 286.
 {¶ 20} We begin by addressing Liberty's first assignment of error. Therein, Liberty challenges two findings of the trial court: (1) that UIM coverage with limits equal to those of the liability policy arose by operation of law because Liberty's offer of UIM coverage to Oldcastle was insufficient under Linko, and a separate Linko-compliant offer of UIM coverage to Shelly was required but was never made; and (2) that the "owned autos only" language does not exclude Parrish from the policy's UIM coverage. We will examine each of Liberty's arguments in turn.
 {¶ 21} First, Liberty argues that appellees are prohibited from arguing that the Liberty policy affords UIM coverage beyond limits of $12,500 per person/$25,000 per *Page 9 
occurrence because appellees are not parties to the contract of insurance. Liberty maintains that where the parties to the contract-Liberty and Oldcastle-"are all in agreement" as to the coverages provided, no one who is not a party may urge for expanded coverage.
 {¶ 22} For support of this proposition Liberty cites a passage from the case of Westfield Ins. Co. v. Galatis, 100 Ohio St.3d 216,2003-Ohio-5849, 797 N.E.2d 1256, in which the Supreme Court of Ohio stated, "where `the plaintiff is not a party to [the] contract of insurance * * *, [the plaintiff] is not in a position to urge, as one of the parties, that the contract be construed strictly against the other party.' Cook v. Kozell (1964), 176 Ohio St. 332, 336, 27 O.O.2d 275,199 N.E.2d 566. This rings especially true where expanding coverage beyond a policyholder's needs will increase the policyholder's premiums." Id. at ¶ 14.
 {¶ 23} Liberty urges an application of this passage that is inapposite to the instant case. Liberty would have us interpret Galatis as announcing a rule that one who is an insured under the contract but who is not a party thereto may never urge that coverage arises by operation of law, as appellees herein contend. But the Galatis court was merely stating that there are some limitations on the general rule that an ambiguity in an insurance contract is ordinarily interpreted against the insurer and in favor of the insured. See Galatis, at ¶ 13.
 {¶ 24} The reason for announcing this limitation was that it formed part of the basis for the court's holding that UIM coverage for an employee outside the scope of employment is extraneous to the general intent of a commercial auto policy issued to the employer, and that, therefore, coverage under Scott-Pontzer v. Liberty Mut. Fire Ins.Co. *Page 10 
(1999), 85 Ohio St.3d 660, 710 N.E.2d 1116, would no longer be extended to employees injured outside the scope of their employment, or to employees' family members.
 {¶ 25} In the present case, it is undisputed that Parrish was injured in the course and scope of his employment with Shelly, a party to the contract of insurance. Indeed, Liberty did not dispute that, pursuant toScott-Pontzer, Parrish is an insured under the liability portion of the contract while operating "any auto." For these reasons, we reject Liberty's argument that appellees are prohibited from urging that a specific type and amount of coverage must be extended to Parrish.
 {¶ 26} Moving on to Liberty's other arguments in support of its first assignment of error, we must first examine the language in the Liberty policy.
 {¶ 27} ITEM ONE of the declarations specifies that the named insured is "Oldcastle, Inc., and as per Endorsement 1." Endorsement 1 contains the names of more than 200 Oldcastle subsidiaries, including Shelly. Section I — Covered Autos provides, in pertinent part:
 ITEM TWO of the Declarations shows the autos that are covered autos for each of your coverages. * * * The symbols entered next to a coverage on the Declarations designate the only autos that are covered autos.
 {¶ 28} The symbol "1" means "any auto" and the symbol "2" means "ownedautos only." "Owned autos" are defined as, "[o]nly those autos you own * * * This includes those autos you acquire ownership of after the policy begins." In Item Two of the Declarations the symbol "1" appears next to liability coverage and the symbol "2" appears next to UIM coverage. Thus, "any auto" is a "covered auto" for purposes of liability coverage, while only "owned autos" are "covered autos" for purposes of UIM coverage. *Page 11 
On its face, the Liberty policy's declarations provide $1,000,000 per accident in liability coverage and $12,500 per person/$25,000 per accident in UIM coverage.
 {¶ 29} Both the general UIM coverage portion of the policy and the Ohio-specific UIM endorsement provide, in pertinent part:
 B. WHO IS AN INSURED
 1. You.
 * * *
 3. Anyone else "occupying" a covered "auto" or a temporary substitute for a covered "auto."
 {¶ 30} This contains the same ambiguity found inScott-Pontzer. Thus, Parrish is an insured because he was injured in the course and scope of his employment with Shelly, a named insured. The trial court correctly held that Parrish's wife is not an insured pursuant to the limits onScott-Pontzer-based coverage outlined inGalatis.
 {¶ 31} "[T]he statutory law in effect at the time of entering into a contract for automobile liability insurance controls the rights and duties of the contracting parties." Ross v. Farmers Ins. Group ofCos. (1998), 82 Ohio St.3d 281, 695 N.E.2d 732, syllabus. The version of R.C. 3937.18(A) in effect on September 1, 1999, the inception date of the policy, provided, in pertinent part:
 No automobile liability or motor vehicle liability policy of insurance insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless both of the following coverages are offered to persons insured under the policy for loss due to bodily injury or death suffered by such insureds: *Page 12 
 * * *
 (2) Underinsured motorist coverage, which shall be in an amount of coverage equivalent to the automobile liability or motor vehicle liability coverage and shall provide protection for insureds thereunder against loss for bodily injury, sickness, or disease, including death, suffered by any person insured under the policy, where the limits of coverage available for payment to the insured under all bodily injury liability bonds and insurance policies covering persons liable to the insured are less than the limits for the insured's uninsured motorist coverage.
 {¶ 32} Pursuant to Linko v. Indemn. Ins. Co. of North America (2000),90 Ohio St.3d 445, 739 N.E.2d 338, to be valid under R.C. 3937.18, a rejection of UIM coverage, or a selection of UIM coverage with limits lower than those applicable to the liability portion of the policy, must follow a written offer of UIM coverage at limits equal to those applicable to the liability portion of the policy. Additionally, the written offer must contain a brief description of the coverage, the premium for that coverage, and an express statement of the coverage limits. In the absence of an offer that comports with the Linko
requirements, any rejection of UIM coverage is meaningless, and that coverage arises by operation of law. Abate v. Pioneer Mut. Cas. Co.
(1970), 22 Ohio St.2d 161, 258 N.E.2d 429, paragraph two of the syllabus.
 {¶ 33} After the court's ruling in Linko, the General Assembly amended R.C. 3937.18 by No. H.B. 261, which governs the offer and rejection of insurance at issue here. In Kemper v. Michigan Millers Mut. Ins.Co., 98 Ohio St.3d 162, 2002-Ohio-7101, 781 N.E.2d 196, the Supreme Court of Ohio held that Linko's requirements are also applicable to the H.B. No. 261 version of R.C. 3937.18. Id. at ¶ 2. Thus, underKemper, even when the H.B. No. 261 version of R.C. 3937.18 is applicable, a rejection of an offer *Page 13 
that fails to satisfy the Linko requirements is invalid, and UIM coverage arises by operation of law. Hollon v. Clary,104 Ohio St.3d 526, 2004-Ohio-6772, 820 N.E.2d 881,
 {¶ 34} In the present case, Liberty challenges the trial court's finding that Liberty's offer to Oldcastle failed to meet the Linko requirements. The record reveals that there was a written offer of UIM coverage to Oldcastle, and a duly authorized representative of Oldcastle executed an unequivocal rejection on the form containing the offer. However, the written offer itself does not contain any premium information that would inform the insured how much it would cost to accept, reject, or choose lower limits of UIM coverage. But the H.B. No. 261 version of R.C. 3937.18(C) provided:
 A named insured's or applicant's written, signed rejection of both coverages as offered under division (A) of this section, or a named insured's or applicant's written, signed selection of such coverages in accordance with the schedule of limits approved by the superintendent * * * shall create a presumption of an offer of coverages consistent with division (A) of this section * * *
 {¶ 35} Based upon this statutory language, the Supreme Court of Ohio in Hollon, supra, concluded that a written offer of UIM coverage, evidencing a rejection or selection of lower limits of UIM coverage, together with evidence that the insured had received a brief description of coverage, an express statement of UIM coverage limits, and the applicable premiums, supports a presumption that a valid offer was made. This, the court held, satisfies the Linko requirement that the insurer make a "meaningful offer." Hollon, at ¶ 13. The Hollon court held, at the syllabus, "[a] signed, written rejection of uninsured/underinsured motorist coverage is valid under the H.B. 261 version of R.C. 3937.18 if it was made in response to an offer that included a brief description of the *Page 14 
coverage and the coverage premiums and limits. Once a signed rejection is produced, the elements of the offer may be demonstrated by extrinsic evidence."
 {¶ 36} In Hollon, the court accepted, as sufficient evidence of the elements of an offer, an affidavit in which the signatory to the selection/rejection form averred that when he signed the form he "was informed, aware, and understood: (a) that UM/UIM coverage was available; (b) the amount of the premium that would be charged for UM/UIM coverage if I selected UM/UIM coverage, or of the reduced premium if I selected reduced UM/UIM limits; (c) what UM/UIM coverage was; and (d) that I was rejecting UM/UIM coverage in its entirety."
 {¶ 37} In the present case, the record contains the two-page form in which Liberty offers UIM coverage in varying limits, along with McWilliams' signature agreeing to Oldcastle's selection of UIM coverage with limits of $12,500 per person/$25,000 per accident. The record also contains McWilliams' affidavit, in which he averred:
 I did knowingly and voluntarily select one of the lower Ohio UM/UIM limits with the commercial auto policy issued by Liberty Mutual Insurance Company to Oldcastle, Inc., by signing the applicable form on September 1, 1999.
 At all times, I was fully aware of the requirements under the laws of Ohio with regard to UM/UIM coverage. In addition, I was informed of the increase in premiums that would be included in the policy if I were to elect a higher amount of UM/UIM coverage under the commercial automobile policy issued by Liberty Mutual to Oldcastle, Inc.
 At the time I executed the rejection/selection form, I was aware that, in Ohio, UM/UIM coverage was required to be offered to Oldcastle, Inc.
 On behalf of Oldcastle, Inc., I knowingly and expressly selected bodily injury uninsured/underinsured motorist *Page 15 
coverage limits in the amount of $12,500 per person/$25,000 per accident in Ohio.
 * * *
 In short, I made an express and knowing acceptance of lower UM/UIM coverage in the amount of $12,500 per person/$25,000 per accident, with complete knowledge of the premiums to be charged, a description of the coverage, and an express statement of the UM/UIM limits.
(McWilliams Aff., ¶ 5-8,10.)
 {¶ 38} Under Hollon, this evidence is sufficient for the court to presume that Liberty made a valid, "meaningful" offer of UIM coverage to Oldcastle. Thus, the requirements of Linko are satisfied with respect toOldcastle.
 {¶ 39} However, it must also be determined whether the evidence shows that Liberty extended a "meaningful offer" to Shelly. Appellees argued, and the trial court agreed, that because there was no evidence that Liberty ever made a separate offer to Shelly that comported with the requirements of Linko, UIM coverage for Shelly under the Liberty policy arose by operation of law, with the same one-million-dollar limit established for liability coverage. The trial court held that the offer to, and selection of lower limits by, Oldcastle does not suffice as a meaningful offer to, and an express, knowing selection of lower limits by Shelly. Liberty challenges this finding.
 {¶ 40} Liberty contends that an incorporated entity such as Shelly need not be offered its own UIM coverage, so long as it agrees to accept the limits chosen by its parent company. We disagree. Linko requires that, "separately incorporated named insureds must each be listed in a rejection form in order to satisfy the offer requirement of R.C. 3937.18
* * *. Only with a subsidiary's written authorization may a parent corporation *Page 16 
reject UM/UIM coverage on the subsidiary's behalf." Linko, supra, at 448. In this way, Linko affirmed the notion that each named insured's rejection or reduction of UIM coverage must be express and knowing.
 {¶ 41} In the present case, Liberty presented the McWilliams affidavit, in which McWilliams avers that he "had full authority to select or reject uninsured/underinsured motorist coverage at different levels of limits up to the liability limits" for all of Oldcastle's subsidiaries. (McWilliams Aff., ¶ 4.) Radabaugh averred that Shelly agreed to join and be bound by the insurance program and coverages that Oldcastle had entered into with Liberty. (Radabaugh Aff., ¶ 3.) However, there is no evidence of record that Shelly provided written authorization for Oldcastle to select reduced limits for UIM coverage on Shelly's behalf. Absent such evidence, there can be no valid reduction of UIM limits for Shelly, notwithstanding McWilliams' assertion that he had Shelly's authority to do so on its behalf. Thus, UIM coverage with limits of $1,000,000 arises not from the contract but by operation of law.
 {¶ 42} The First Appellate District reached the same conclusion on identical facts in the case of Morton v. Continental Cas. Ins. Co., Hamilton App. No. C-030771, 2004-Ohio-7126, discretionary appeal not allowed, 105 Ohio St.3d 1544, 2005-Ohio-2188, 827 N.E.2d 326.Morton considered the effect of the Supreme Court of Ohio's ruling inHollon.
 {¶ 43} In Morton, a parent corporation signed a rejection of coverage for a subsidiary, and the subsidiary produced an affidavit stating that the parent's signatory was authorized to accept or reject coverage for both the parent and its subsidiaries. Notwithstanding this extrinsic evidence, the Morton court held that UIM coverage arose by operation of law for the subsidiary because there was no evidence of a written rejection *Page 17 
by the subsidiary. In so holding the Morton court concluded, "[b]ecause the Hollon court did not specifically address that portion of theLinko decision that required * * * that the `subsidiary's authorization to a parent corporation to waive UM coverage benefits on its behalf must be in writing and must be incorporated into the contract,' we decline to extend the supreme court's holding in Hollon to permit the admission of extrinsic evidence on that issue." Id. at ¶ 21. Accord Inlow v.Davis, Clermont App. No. CA2002-08-071, 2003-Ohio-3070, ¶ 19.
 {¶ 44} Liberty cites the case of Rice v. Progressive Max Ins.Co., Cuyahoga App. No. 83970, 2004-Ohio-6107, for the proposition that the selection/rejection form that Mr. McWilliams executed, coupled with his affidavit testimony that he had the authority to execute the form on Shelly's behalf, satisfies the requirements of Linko. The court inRice indeed found a form executed by the parent company's agent to be sufficient, in the absence of other evidence (which the court placed the burden on the insured to produce) that the subsidiary had authority to make "insurance and risk management decisions independent of its parent company." Rice, at ¶ 10.
 {¶ 45} But that result contradicts the rule of law that a parent corporation and its subsidiary are two separate and distinct legal entities. Linko, at 449, citing North v. Higbee Co. (1936),131 Ohio St. 507, 6 O.O. 166, 3 N.E.2d 391. We find no basis for not applying theLinko requirement that "a subsidiary's authorization to a parent corporation to waive UM/UIM coverage benefits on its behalf must be in writing and must be incorporated into the contract." Id. at 450. See, also, Oblinger v. State Auto Ins. Cos., 163 Ohio App.3d 266,2005-Ohio-4695, 837 N.E.2d 815; Hicks-Malak v. Cincinnati Ins. *Page 18 Cos., Lucas App. No. L-04-1272, 2005-Ohio-2745, discretionary appeal not allowed, 106 Ohio St.3d 1546, 2005-Ohio-5343, 835 N.E.2d 727.
 {¶ 46} Liberty also cites the case of Byer v. Wright,160 Ohio App.3d 472, 2005-Ohio-1797, 827 N.E.2d 835, in which the court employed a straightforward application of Hollon and determined that a rejection form, coupled with the affidavit of its signatory, satisfied the requirements of Linko. But that case, too, is inapplicable herein because the signatory was an agent of the employer itself, not of any parent company purporting to possess authority to sign the form on behalf of the employer's agents.
 {¶ 47} Liberty next argues that Oldcastle's selection of lower limits for UIM coverage satisfies the requirements of Linko with respect to an offer to Shelly because the applicable version of R.C. 3937.18 specifies that such a selection is "binding upon all other named insureds."
 {¶ 48} The applicable version of R.C. 3937.18(C) provided, in pertinent part:
 A named insured's or applicant's rejection of both coverages as offered under division (A) of this section, or a named insured's or applicant's selection of such coverages in accordance with the schedule of limits approved by the superintendent, shall be in writing and shall be signed by the named insured or applicant. A named insured's or applicant's written, signed rejection of both coverages as offered under division (A) of this section, or a named insured's or applicant's written, signed selection of such coverages in accordance with the schedule of limits approved by the superintendent, shall be effective on the day signed, shall create a presumption of an offer of coverages consistent with division (A) of this section, and shall be binding on all other named insureds, insureds, or applicants.
(Emphasis added.) *Page 19 
 {¶ 49} Liberty argues that the foregoing language "expressly permits" Oldcastle to select or reject UIM coverage on behalf of Shelly. We agree that the language of R.C. 3937.18(C) does expressly permit such an action. If a named insured selects reduced UIM limits on behalf of another, in accord with the express written selection of those limits bythe other named insured, then the action is indeed binding on the other insured.
 {¶ 50} But, again, there is no evidence that Shelly selected the lower UIM limits expressly and in writing so as to confer authority upon Oldcastle to sign the selection form on its behalf. Therefore, there was no authority in the first instance that would allow Oldcastle to bind Shelly in this way. This is in accord with "* * * long-established Ohio law [that says] UM/UIM coverage can be removed from an insurance policy `only by the express rejection of that provision by the insured.'" Linko, at 449, quoting Abate v. Pioneer Mut. Cas. Co. (1970),22 Ohio St.2d 161, 51 O.O.2d 229, 258 N.E.2d 429, paragraph one of the syllabus. This is also in keeping with the language of R.C. 3937.18(C), which gives the power to the "named insured" to accept or reject UIM coverage. Liberty cites several cases of the intermediate appellate courts for the proposition that a newly added insured is bound by a policy's existing terms. However, the cases cited all predateLinko.
 {¶ 51} Absent a written selection of the lower limits by Shelly, the selection/rejection form in the record in this case fails to satisfy the requirements of Linko with respect to Shelly, notwithstanding McWilliams' affidavit. Therefore, UIM coverage with limits of $1,000,000 arises by operation of law. Kinsey v. Erie Ins. Group, Franklin App. No. 06AP-139, 2006-Ohio-5786. *Page 20 
 {¶ 52} Liberty argues that the trial court nonetheless erred in granting appellees summary judgment because Parrish is not entitled to UIM coverage regardless whether such coverage arises from contract or law. Liberty points out that the policy declarations specify that only "owned autos" are "covered autos" for purposes of UIM coverage, and "owned autos" are defined as "[o]nly those autos you own * * * This includes those autos you acquire ownership of after the policy begins." Liberty maintains that because the business auto policy provides that "you" and "your" mean "the person or organization shown as the named insured in ITEM ONE of the declarations"-Oldcastle and its subsidiaries, including Shelly-then the UIM coverage extends only to injuries involving automobiles owned by Oldcastle or one of its subsidiaries. Liberty contends that because Parrish was in a vehicle owned by Mifflin Township, not Oldcastle or a subsidiary thereof, he was not operating an "owned auto," and is thus excluded from UIM coverage.
 {¶ 53} Appellees, on the other hand, argue that because UIM coverage arises by operation of law and not from the contract, contractual exclusions such as the "owned auto" exclusion are inapplicable. The parties cite and discuss numerous cases from the various Ohio appellate districts, and we have read and considered each one, though we will discuss only those that we have determined are germane to our disposition of Liberty's argument concerning the "owned autos" language.
 {¶ 54} This court has consistently held that when UM/UIM coverage arises by operation of law because a purported rejection of such coverage is deemed defective under Linko, express exclusions within the policy are inapplicable to the UM/UIM coverage. See, e.g., Demetry v.Kim (1991), 72 Ohio App.3d 692, 595 N.E.2d 997; McNeeley v. PacificEmployers Ins. Co., Franklin App. No. 02AP-1217, 2003-Ohio-2951; *Page 21 Heiney v. The Hartford, Franklin App. No. 01AP-1100, 2002-Ohio-3718, reversed on other grounds, 99 Ohio St.3d 1519, 2003-Ohio-4115,792 N.E.2d 1134; Goettenmoeller v. Meridian Mut. Ins. Co. (June 25, 1996), Franklin App. No. 95APE11-1553.
 {¶ 55} The rationale for this holding has been that the parties to an insurance contract, who negotiated the exclusions therein, could not have contemplated that those exclusions would apply to UM/UIM coverage that the insured tried to reject and, therefore, was never contemplated in the first instance. See Demetry, supra, at 698; McNeeley, supra, at ¶ 18; Heiney, supra, at ¶ 32; Goettenmoeller, supra, 1996 Ohio App. LEXIS 2764, at *11[2]
 {¶ 56} In the present case, the parties did not intend that UIM coverage would have a limit equal to that in the liability portion of the policy, but because there was no Linko-compliant offer and reduction respecting Shelly, a UIM coverage limit of $1,000,000 arises by operation of law. But it is only the increased limit that arises by operation of law; the existence of UIM coverage is established not by operation of law due to an invalid rejection of such coverage, as inDemetry and its progeny, but because the parties clearly contemplated that it would exist. The declarations and the UIM endorsement contained in the Liberty policy indicate that the parties did intend that UIM coverage be afforded to insureds under the policy. Therefore, unlike in the previously cited cases, it cannot be *Page 22 
said that the parties never contemplated such coverage. Thus, the rationale for our holdings in Demetry and its progeny does not apply to the facts of the instant case.
 {¶ 57} Here, the parties did contemplate some UIM coverage; the question is whether they contemplated that it would be available to an insured such as Parrish, who sustained damages while operating a vehicle not owned by any named insured. It is clear from the plain language of the policy that they did not. The policy declarations specify that only "owned autos" are "covered autos" for purposes of UIM coverage, and "owned autos" are defined as "[o]nly those autos you own." "You" refers to the named insureds. None of the named insureds owned the vehicle in which Parrish was injured. As such, it is clear that the parties did not intend for UIM coverage to be extended to Parrish for this accident.
 {¶ 58} It is appropriate to apply this exclusion to the UIM coverage that exists here because the parties contemplated UIM coverage in the first instance and, therefore, contemplated the application of their negotiated exclusions to that coverage in the same manner that they intended that the exclusions would apply to the liability portion of the policy.
 {¶ 59} The Fourth Appellate District has reached the same conclusion on similar facts. In Hixson v. Callentine, 159 Ohio App.3d 146,2004-Ohio-5943, 823 N.E.2d 459, the plaintiff sought UIM coverage under his employer's automobile insurance policy. The policy declarations specified a limit of $1,000,000 for liability and reduced limits of $25,000 for UM/UIM coverage. Hixson argued that the purported reduction was invalid under Linko and, therefore, UIM coverage with limits of $1,000,000 arose by operation of law. *Page 23 
 {¶ 60} The policy contained a "hired autos" endorsement that provided that "who is an insured" included the owner of any vehicle rented or leased to the employer and used by or for the employer. In the trial court, the insurer had admitted that Hixson was an insured under the definition of "covered autos" in the policy by virtue of the fact that he leased his vehicle to his employer.[3] It also admitted that the purported offer and reduction of UM/UIM coverage did not comply withLinko's requirements.
 {¶ 61} Hixson was injured while riding his motorcycle, not the truck that he leased to his employer. Nonetheless, Hixson argued that restrictive language in the policy that included him as an insured only for the "covered auto"-that is, the vehicle he leased to his employer-did not apply to the UIM coverage because that coverage arose by operation of law. The court of appeals observed that the Supreme Court of Ohio in Galatis, emphasized "the intent of the parties is paramount." Id. at ¶ 55.
 {¶ 62} The Hixson court held that, assuming that UM/UIM coverage arose by operation of law, and in light of Galatis and the facts in theHixson case, it was appropriate to apply the exclusionary language of the policy to the UIM coverage. The court explained:
 We note that in Galatis, there was no allegation that UM/UIM coverage arose as a matter of law under Linko. However, we also note that the Ohio Supreme Court has reversed several cases on the authority of Galatis where the courts of appeal found that UM/UIM coverage arose by operation of law. See In re Uninsured Underinsured Motorist Coverage Cases, 100 Ohio St.3d 302, 2003-Ohio-5888, 798 N.E.2d 1077. *Page 24 
 * * *
 Here, the liability portion of the policy at issue clearly states that "while any covered `auto' described in the Schedule is rented or leased to you and is being used by or for you, its owner or anyone else from whom you rent or lease it is an `insured' but only for that covered `auto'." The parties do not dispute that Hixson leased his truck to Iddings, and that his truck was a "covered `auto'" under the policy. Thus, the plain language of the liability portion of the motor carrier policy evidences Westport and Iddings' intent to insulate Iddings from any liability that might arise from Hixson's use of his truck while he leased it to Iddings. This language, defining Hixson as an "insured" only when he was driving "that covered `auto[,]'" also plainly indicates Westport and Iddings intention to exclude Hixson's use of his personal motorcycle, or other personal auto, from the policy's liability coverage.
 Additionally, the policy declarations plainly state Westport and Iddings' intention to include UM/UIM coverage of $25,000 per accident under the policy. The policy clearly evidences the intention of the parties to include some amount of UM/UIM coverage — regardless of whether Westport properly offered UM/UIM coverage equal to the liability limits of the policy, or whether Iddings effectively selected lesser UM/UIM coverage limits under R.C. 3937.18 and Linko. Furthermore, the UM coverage form in the Westport policy defined "Insureds" when the named insured is a corporation to include:
 a. Anyone "occupying" a covered "auto" or a temporary substitute for a covered "auto". The covered "auto" must be out of service because of its breakdown, repair, servicing, "loss" or destruction.
 b. Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured".
 Unlike the situation presented in Scott-Pontzer, where the parties to the insurance contract did not contemplate any UM/UIM coverage under the subject umbrella policy, Westport and Iddings expressed a clear intention to include UM/UIM coverage under the policy at issue here. Furthermore, they also expressed a clear intention to limit UM/UIM coverage to persons occupying a "covered `auto'". Hixson presents no argument that his personal motorcycle was a "covered `auto'" under the Westport policy. *Page 25 
(Emphasis sic.) Id. at ¶ 20, 22-24.
 {¶ 63} We agree with this reasoning, and believe it is applicable to the instant case. Moreover, this rationale is in accord with the fundamental contract principles expressed in Galatis, and does not offend the sound logic underlying Demetry and its progeny.
 {¶ 64} Here, it is clear that the parties to the Liberty policy intended for UIM coverage to exist under the policy. It is also clear that they intended to exclude such coverage for occurrences that involve autos not owned by one of the named insureds. This is true notwithstanding the fact that higher limits than those specified in the contract arise by operation of law. Because Parrish was not operating a covered auto for purposes of UIM coverage, he is not entitled to such coverage under the Liberty policy. Accordingly, the trial court erred in denying summary judgment to Liberty on that basis. For this reason, Liberty's first assignment of error is sustained. Our disposition of Liberty's first assignment of error renders its second assignment of error moot.
 {¶ 65} We now turn to Travelers' single assignment of error, which challenges the trial court's order that Travelers pay prejudgment interest on the judgment from the date of Parrish's accident. Travelers argues that prejudgment interest should not be assessed from any date earlier than the date upon which Coles' insurer tendered its policy limits, because UIM coverage was not triggered until the tortfeasor's policy limits were exhausted. In this way, Travelers maintains, the focus appropriately remains on the contractual nature of the claim for UIM coverage. Appellees argue that the trial court has *Page 26 
broad discretion in selecting a date upon which prejudgment interest will begin to be assessed, and the trial court here did not abuse that discretion.
 {¶ 66} Prejudgment interest in this case is predicated upon R.C.1343.03(A), which provides:
 In cases other than those provided for in sections 1343.01 and 1343.02 of the Revised Code, when money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate per annum determined pursuant to section 5703.47 of the Revised Code, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract. Notification of the interest rate per annum shall be provided pursuant to sections 319.19, 1901.313, 1907.202, 2303.25, and 5703.47 of the Revised Code.
 {¶ 67} UIM claims are contract claims subject to prejudgment interest under R.C. 1343.03(A). Landis v. Grange Mut. Ins. Co. (1998),82 Ohio St.3d 339, 341, 695 N.E.2d 1140. Whether UIM benefits were denied in good faith is irrelevant because an award of prejudgment interest under R.C. 1343.03(A) is not predicated on lack of a good-faith effort to settle, as is an award of prejudgment interest under R.C. 1343.03(C). Id.
 {¶ 68} Once a plaintiff receives judgment on a contract claim, the trial court has no discretion but to award prejudgment interest under R.C. 1343.03(A). First Bank of Marietta v. L.C. Ltd. (Dec. 28, 1999), Franklin App. No. 99AP-304. The only issue for resolution by a trial court with respect to prejudgment interest under R.C. 1343.03(A) is *Page 27 
how much interest is due. Zunshine v. Cott, Franklin App. No. 06AP-868,2007-Ohio-1475, ¶ 26.
 {¶ 69} In Landis, supra, the Supreme Court of Ohio "specifically and clearly declined to establish a bright-line rule regarding the accrual date of prejudgment interest but rather left such a determination to the trial courts on a case-by-case basis." Miller v. Gunckle,96 Ohio St.3d 359, 2002-Ohio-4932, 775 N.E.2d 475, ¶ 32. The Supreme Court of Ohio has also held, "in determining whether to award prejudgment interest pursuant to R.C. * * * 1343.03(A), a court need only ask one question: Has the aggrieved party been fully compensated?" Royal Elec. Constr.Corp. v. Ohio State Univ. (1995), 73 Ohio St.3d 110, 116,652 N.E.2d 687.
 {¶ 70} The Royal Electric court went on to hold, "[t]he award of prejudgment interest is compensation to the plaintiff for the period of time between accrual of the claim and judgment, regardless of whether the judgment is based on a claim which was liquidated or unliquidated and even if the sum due was not capable of ascertainment until determined by the court." Id. at 117.
 {¶ 71} In Zunshine, supra, this court explained:
 The trial court must make factual determinations as to when interest commences to run, based on when the claim became due and payable, and as to what legal rate of interest applies. Thus, although the right to prejudgment interest on a contract claim is a matter of law, pursuant to R.C. 1343.03(A), the amount awarded is based on the trial court's factual determinations of the accrual date of the plaintiff's claim and the applicable interest rate. Courts of appeals review such factual determinations under an abuse of discretion standard. *Page 28 
(Citations omitted.) Id. at ¶ 26. Abuse of discretion implies that the court's attitude was unreasonable, arbitrary or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, 5 OBR 481,450 N.E.2d 1140.
 {¶ 72} In Landis, supra, the Supreme Court of Ohio stated, "whether the prejudgment interest * * * should be calculated from the date coverage was demanded or denied, from the date of the accident, * * * or some other time based on when [the insurance company] should have paid [the plaintiff] is for the trial court to determine." Landis, at 342. In so holding the high court vested broad and expansive discretion in the trial court. In light of that standard, we decline to find an abuse of discretion in the trial court's award of prejudgment interest from the date of the accident. For this reason, Travelers' assignment of error is overruled.
 {¶ 73} Upon consideration of the parties' arguments in support thereof, we sustain Liberty's first assignment of error, overrule as moot Liberty's second assignment of error, and overrule Travelers' single assignment of error. Therefore, we reverse in part and affirm in part the judgment of the Franklin County Court of Common Pleas, and we remand this matter for proceedings consistent with this opinion.
Judgment affirmed in part and reversed in part; cause remanded.
PETREE and KLATT, JJ., concur.
[1] "Uninsured motorist."
[2] Appellees also cite the case of Carmona v. Blankenship, Franklin App. No. 02AP-14, 2002-Ohio-5003, for the proposition that policy exclusions are inapplicable to modify UIM coverage that arises by operation of law. From a reading of paragraph 23 of that opinion, it appears that the Carmona court refused to apply the particular "other-owned auto" exclusion not based strictly on Demetry, but because the exclusion the insurer relied upon to deny UM coverage was contained in a separate UM endorsement pertaining to reduced UM coverage for employees driving company cars; the exclusion did not pertain to general UM coverage for those otherwise qualifying as insureds. Thus, the case is slightly different from this case and from the other cases we have cited. However, given that the Carmona court made reference to the appellant's Demetry-based argument, it is fair to say that inCarmona we intended to adhere to the rationale expressed inDemetry.
[3] The name of the employer was Iddings Trucking, Inc., and was referred to in the Hixson opinion as "Iddings." *Page 1